George LAMBORN, Henry Maringer, and Lamar Commodities, a Partnership, Plaintiffs–Appellees,

v.

Thomas H. DITTMER and Dittmer International, Inc., Defendants–Appellants.

No. 381, Docket 87–7671.

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1988.

Decided April 10, 1989.

Jack Weinberg, New York City (Graubard Mollen Dannett & Horowitz, of counsel), for defendants-appellants.

Peter Fleming, Jr., New York City (Curtis, Mallet–Prevost, Colt & Mosle, of counsel), for plaintiffs-appellees.

Before PIERCE and PRATT, Circuit Judges, and KENNETH CONBOY, District Judge for the Southern District of New York (sitting by designation).

CONBOY, District Judge:

Plaintiff Thomas H. Dittmer ("Dittmer") appeals from a judgment entered against him after a jury trial held before District Judge Robert L. Carter. The jury found that Dittmer wrongfully terminated a partnership between plaintiffs and himself and awarded plaintiffs $30 million, which represented half of the value of the partner-

ship's business at the time of trial. On appeal, Dittmer contends principally (1) that plaintiffs were improperly permitted to argue and present evidence on a theory of liability that was not disclosed until the eve of trial, (2) that it was error for the judge to deny defendants' motion for summary judgment and judgment notwithstanding the verdict, (3) that the judge erred by refusing to let defendants' counsel call one of plaintiffs' lawyers, Herbert Stoller, as a witness, and (4) that the evidence was insufficient to support the jury's damage award. Because we find that the judge should have allowed Dittmer's counsel to call Stoller as a witness, we reverse.

## BACKGROUND

In 1981, defendant-appellant Dittmer was the majority shareholder of Refco, Inc. ("Refco"), a commodity futures commission merchant and clearing firm. Refco was a large, prominent, and diverse corporation which, before the trial, was capitalized with $150,000,000. In the words of one witness, Refco was a "Cadillac of the industry."

Despite its size and standing domestically, Refco had, in 1981, virtually no presence in the international commodities market, a situation Dittmer sought to change. To do so, he contacted plaintiff-appellee George Lamborn, then working as an independent commodities broker in Connecticut. Initially, Dittmer offered Lamborn a position as an employee of Refco but he eventually agreed to consider developing some form of independent venture to be jointly owned by Lamborn. After Lamborn convinced Dittmer that it would be necessary to involve a third principal, Lamborn's friend and business associate Henry Maringer, then the president of a commodities company called ACLI, was invited into the negotiations. During their discussions, each party was represented by counsel: Dittmer by

Tone Grant, Lamborn by Martin Honig, and Maringer by Herbert Stoller.[1]

In November 1981, the parties executed a letter agreement to form a joint venture, the primary purpose of which would be the establishment of an international sales agent that would clear its business through Refco. The letter anticipated a more comprehensive contract and in December 1981, Dittmer entered into a partnership agreement with Lamar Commodities, itself a partnership comprised of Lamborn and Maringer, to form an international commodities sales agent. The partnership would be conducted under the name Refco International Futures ("RIF" or "the partnership").

The partnership agreement provided that Dittmer would capitalize the business with a minimum of $3 million. Lamar's (Lamborn and Maringer's) responsibility was to build and manage the partnership's business for which it would receive a $600,000 annual fee. Furthermore, under Section 5.1 of the agreement, 40% of the partnership's net profits and losses were to be allocated to Lamar.[2]

The agreement provided for a 30–year term but the partnership could be terminated by Dittmer at an earlier date under the following conditions:

> 9.1 *Dittmer's Right to Cause the Dissolution of the Partnership.* If at any time the cumulative net losses of the Partnership equal or exceed $600,000, including as expenses for the purposes hereof the management fee provided for in Section 7.5 hereof, Dittmer shall have the right to cause the dissolution of the Partnership without being in contravention of the Agreement, provided, however, that within thirty days after receipt of written notice thereof from Dittmer, Lamar may purchase Dittmer's interest

---

**1.** There are indications in the record that Stoller eventually represented both Lamborn and Maringer.

**2.** Section 5.1 provided in pertinent part as follows:

> The net profits and losses of the Partnership, as determined by the Partnership's independent auditors in accordance with general-

ly accepted accounting principles ... shall be allocated 60% to Dittmer and 40% to Lamar, provided however that for all times when the capital contributions of Dittmer and Lamar are equal such net profits and losses of the Partnership shall be allocated 50% to Dittmer and 50% to Lamar.

in the Partnership at a price computed as in Section 8.1(a)(ii) hereof.

If Dittmer properly exercised his rights under Section 9.1, he also had the right to continue the business:

10.1 Upon dissolution of the Partnership for any reason whatsoever ... Dittmer shall be entitled to continue the business and operations of the Partnership at his discretion and in any form he may choose.

Early on, the partners decided to run the partnership's business through a corporation, principally to insulate themselves from liability to third parties. For this purpose they formed RIF New York, Inc. ("RIF–NY" or "the corporation"), a wholly owned subsidiary of Refco International Futures, Inc., which was in turn owned by the partnership. From the business' inception, it appears that the partnership agreement was performed through RIF–NY. Specifically, Dittmer made his obligatory capital contributions directly to and Lamar took its management fees directly from the corporation.

In performing their end of the agreement, plaintiffs were fairly successful at establishing the partnership's presence in the international commodities market. Among other things, they entered the precious metals market and started a foreign exchange trading business, they became the first American company to obtain full membership on the London Sugar Exchange, they joined the Sydney, Australia futures exchange through their participation in a joint venture with another company, and they developed markets in Hong Kong and Germany. At a Refco conference in May of 1982, Dittmer complimented plaintiffs for putting Refco "on the globe internationally."

Nonetheless, the business lost money from its inception and continued to do so until about February 1983. By March of 1982, three months into RIF's existence, losses exceeded $600,000. In October 1982, despite substantial losses, Dittmer loaned an additional [3] $2.2 million to the business after plaintiffs agreed to reduce their management fees. By February 1983, Dittmer had contributed a total of $4.7 million to the business yet RIF–NY was $2.8 million in the red. On March 7, 1983, Dittmer told Lamborn and Maringer that he was terminating the partnership. At the same time he was taking steps to salvage the business—or to steal it according to plaintiffs—sending representatives to speak with RIF's brokers in London and New York. Eventually, 10 of RIF's brokers joined other sales agents associated with Refco.

Soon thereafter, plaintiffs filed a complaint against Dittmer alleging that he had dissolved the partnership in violation of his fiduciary duties and in contravention of the partnership agreement so that he could obtain the partnership's customers, goodwill, employees, and other assets for his own benefit. Dittmer answered by invoking Section 9.1 of the agreement and, relying on Section 5.1, counterclaimed for 40% of RIF's losses. The jury found for plaintiffs on both claims, awarding them $30,000,000, which represented their half share of the fair market value of the partnership at the time of trial.

## DISCUSSION

Dittmer raises a host of alleged errors in the trial, only a few of which require extended discussion. The first issue raised on appeal is whether, as Dittmer asserts, plaintiffs were allowed to convert the case into a fraud action on the eve of trial. According to Dittmer, this eleventh-hour conversion violated his due process rights and Fed.R.Civ.P. 16. In addition, he argues that certain evidence offered and received in support of the fraud claim violated Federal Rules of Evidence 608(b) and 403. Before addressing these arguments, it is necessary to summarize briefly the pretrial evolution of the case.

The complaint, filed in 1983, alleged in substance that Dittmer a) violated his fiduciary duty to the partnership by soliciting the partnership's customers and employees without plaintiffs' consent, and b) dissolved the business.

---

3. Dittmer had previously loaned $2,450,790 to

the partnership in contravention of the partnership agreement. The pre-trial order, filed in 1984, expanded upon but did not significantly alter these contentions. One of several issues of fact designated by the parties was whether "RIF incurred losses in excess of $600,000."

Dittmer moved for partial summary judgment in May 1985, submitting in support thereof an accountant's audit of the partnership's business showing that its net losses exceeded $2.8 million, thus triggering Dittmer's rights under Section 9.1 of the agreement. Confronted with the audit, plaintiffs responded, *inter alia,* that the net losses were entirely in RIF–NY and could not be attributed to the RIF partnership. In support of their position, referred to by Dittmer as the "Business Form Distinction," plaintiffs submitted four promissory notes, evidencing Dittmer's capital contribution to the business, running directly from RIF–NY to Dittmer. Since no cash flowed to or from the partnership, plaintiffs argued, it could not be deemed to have suffered losses within the meaning of Section 9.1 of the agreement. In a footnote to their summary judgment memorandum, plaintiffs noted the existence of a parallel set of promissory notes, produced by Dittmer during discovery, which purport to run directly from *the partnership* to Dittmer, but plaintiffs added that "Dittmer does not rely upon the existence of those notes for purposes of [the summary judgment motion]." It was and is Dittmer's position that the distinction between the partnership and the subsidiary corporation is entirely artificial. Dittmer's motion for partial summary judgment and plaintiffs' cross-motion for partial summary judgment were both denied.

In June 1987, 10 days before trial, plaintiffs had a change of heart about the significance of the parallel notes, moving to add a claim for punitive damages on the ground that the notes were fictitious, created solely to provide the appearance that the partnership and not RIF–NY suffered the requisite losses. The judge denied the motion to amend but observed that the parallel notes were relevant to the claims already asserted in the complaint.

After receiving a green light to use the parallel notes in support of their claims, the focus of plaintiffs' case became the Business Form Distinction, according to Dittmer. Plaintiffs hammered away at Dittmer's alleged fraudulent intent in drafting the "false" notes, the execution of which, it was argued, impliedly acknowledged the validity of the Business Form Distinction. This occurred, Dittmer maintains, despite the total absence of the Business Form Distinction and the associated fraud allegations from the pre-trial order. Dittmer now insists that the last-minute change in the case violated Rule 16, and the use of the promissory notes and related evidence violated Fed.R.Evid. 608(b) and 403.

Turning first to the Rule 16 argument, we reject Dittmer's assertion that plaintiffs were permitted to try a fraud claim that was not raised or even hinted at in the pre-trial order. Plaintiffs used the parallel notes to undermine Dittmer's professed interpretation of the contract. The ultimate issue was, and remained throughout the case, the meaning of Section 9.1. Dittmer cannot seriously contend, as a general matter, that deceitful conduct in the performance of a contract or inconsistencies between a litigant's trial position and its prior conduct can never be relevant in resolving a contract claim:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoilation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the causes's lack of truth and merit.

2 Wigmore, Evidence § 278, at 133 (Chadbourn rev. 1979) (emphasis in original).

■ It does not follow, however, from our conclusion that the Business Form Distinction was used to support a contract claim, that the theory was adequately dis-

closed in the pre-trial order. Indeed, notwithstanding the view of most circuits that pre-trial orders should be liberally construed, *see* 3 J. Moore, *Moore's Federal Practice* ¶ 16.19, at 16–77 to 78 (2d ed. 1988); *e.g., Miller v. Safeco Title Ins. Co.,* 758 F.2d 364, 368 (9th Cir.1985); *Howard v. Kerr Glass Mfg. Co.,* 699 F.2d 330, 333 (6th Cir.1983); *Geremia v. First Nat'l,* 653 F.2d 1, 5 (1st Cir.1981); *Stone v. First Wyoming Bank N.A.,* 625 F.2d 332, 347 (10th Cir.1980), it would be fair to say that the pre-trial order alone did not give Dittmer reasonable notice of the Business Form Distinction. But Rule 16 was not intended to function as an inflexible straightjacket on the conduct of litigation or to produce an abstract, perfect equivalence between the pretrial papers and the course of litigation; instead, it was intended to insure the efficient resolution of cases and, most importantly, minimize prejudicial surprise. *See Clark v. Pennsylvania R.R. Co.,* 328 F.2d 591, 594 (2d Cir.), *cert. denied,* 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964); 3 J. Moore, *supra,* ¶¶ 16.18 through 16.19; *cf. McFadden v. Sanchez,* 710 F.2d 907, 911–12 (2d Cir.) (proper to try claim not designated in pre-trial order where defendant is neither surprised nor prejudiced), *cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983).

Dittmer cannot possibly claim that he was prejudiced by plaintiffs' deviation from the pre-trial order since the Business Form Distinction was squarely raised in 1985 when plaintiffs cross-moved for summary judgment. Among other things, plaintiffs accused Dittmer of attempting:

> to deceive this Court into believing that the Partnership had losses, when [the defendants] know it had none. In fact, all the losses of the business were incurred by a second-tier subsidiary corporation of the Partnership, not by the Partnership itself. Defendants have purposely concealed the distinction between the two entities, and have not advised the Court in their affidavits and memorandum that all losses were incurred by the corporation, not the Partnership.

This argument was presented more than once in plaintiffs' memorandum:

> The Partnership did not incur losses in excess of $600,000. In fact, the Partnership did not incur *any* losses.
>
> Plaintiffs claim that Dittmer wrongfully dissolved *the Partnership.* Dittmer's defense is that *the Partnership* incurred losses in excess of $600,000. It is therefore the losses of *the Partnership,* if any, that are relevant to the determination of plaintiffs' claim and Dittmer's defense. In his motion papers, Dittmer has pretended to address that issue but in fact he has not done so at all. He has only presented evidence that the Partnership's second-tier corporate subsidiary incurred losses. He has presented no evidence that such losses were Partnership losses. The indisputable evidence is that the Partnership had no losses.

(emphasis in original). If the pre-trial order did not put Dittmer on notice of the Business Form Distinction, the summary judgment motion surely did. Thus, Dittmer had approximately two years to prepare his defense. *Cf. Tupman Thurlow Co. v. S.S. Cap Castillo,* 490 F.2d 302, 309 (2d Cir.1974) (where litigant was prepared to cope with evidence not identified in pretrial order, it was not error to admit evidence); *NRT Metals v. Manhattan Metals,* 576 F.Supp. 1046, 1053 (S.D.N.Y.1983) (although pre-trial order is binding on parties, issue should not be foreclosed where complaining party had meaningful opportunity to address argument and, therefore, could not claim surprise and unfairness). Although Dittmer may have been taken off guard by the manner in which the promissory notes were used, the cases relied on by him do not go so far as to say that Rule 16 compels a litigant to detail its trial tactics beyond articulating its theories and identifying the evidence likely to be introduced in support thereof.

▮ Apart from the issue of surprise, Dittmer further complains that plaintiffs made repeated and unfair use of the allegedly fraudulent promissory notes in violation of Fed.R.Evid. 608(b) and 403. Rule 608, prohibits proof, by extrinsic evidence, of past conduct of a witness for the purpose of attacking his credibility. The rule

is inapplicable in determining the admissibility of evidence introduced to impeach a witness's testimony as to a material issue. *United States v. James*, 609 F.2d 36, 46 (2d Cir.1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *United States v. Opager*, 589 F.2d 799, 802 (5th Cir.1979). Since the principal issue in the case became whether the distinction between the corporation and the partnership should be recognized for purposes of calculating partnership losses, the execution of false documents indicating that Dittmer made loans to the partnership directly, rather than to the corporations, could support the inference that Dittmer knew, despite his litigation posture, that the difference mattered. This falls squarely within Rule 404(b) which permits evidence of other "wrongs or acts" to prove knowledge. *See United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 531 (4th Cir.) ("Rule 608(b) should not be read so broadly as to disallow the presentation of extrinsic evidence that is probative of a material issue in a case."), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985).

■ We also are unpersuaded by Dittmer's argument that the notes' probative value, if any, was substantially outweighed by the danger of unfair prejudice. In addition to reasonable inferences that might have been drawn from the mere existence of the notes—principally, that there must have been some significance in Dittmer's view between the flow of money to the partnership and to the corporation directly—plaintiffs' expert testified that the parallel promissory notes were not prepared on the dates indicated but sometime after. This contradicted the deposition testimony of Dittmer's accountant who said that the notes were accurately dated and reflected the flow of money directly through the partnership. We are also constrained to note, notwithstanding Dittmer's present protestations about the number of permissible innocent inferences to be drawn from the notes, that no innocent explanations for the existence of the parallel notes were offered during the trial.

■ We turn next to Dittmer's argument that the trial judge should have entered judgment notwithstanding the verdict on the construction and application of Sections 9.1 and 5.1 of the partnership agreement. He asserts that because both sections were unambiguous, they should have been interpreted in his favor by the Court. Although, as explained below, we have doubts about the merits of plaintiffs' claims, we cannot agree that their case was deficient as a matter of law. First, with regard to Section 5.1, if the jury properly accepted plaintiffs' argument that there were no losses in the partnership, it is of course unnecessary to decide whether plaintiffs were obligated to contribute to the partnership's net losses because none existed. Indeed, this is the more logical conclusion if one looks to the literal language of both provisions as Dittmer has urged. But even if the business' overall losses were attributable to the partnership, we cannot say as a matter of law that Section 5.1 compelled plaintiffs to cover their share of the losses through actual out-of-pocket payments. Dittmer relies principally on the common statutory rule that partners share losses as well as profits but, like many provisions of the various partnership acts, the rule may be disregarded or varied by agreement. *Century Universal Enters. v. Triana Dev. Corp.*, 158 Ill.App.3d 182, 110 Ill.Dec. 229, 235–36, 510 N.E.2d 1260, 1266–67 (1987).[4] The testimony of plaintiffs' expert, an accountant, on the meaning of Section 5.1, and at least one of the dictionary definitions of "allocate" offered by Dittmer at trial—"to apportion and distribute (as costs or revenues) among accounts according to some predetermined ratio or agreed measure of involvement"—constituted sufficient evidence from which a reasonable juror could have found that the disputed provision did not compel plaintiffs to contribute capital to cover a deficit, but merely required that net losses be reflected on each partner's capital account in accordance with the agreed upon ratio.

4. The partnership agreement is governed by Illinois law.

In support of his construction of Section 9.1, Dittmer relies on the unassailable proposition "that substance and not form should be the controlling criterion in determining the nature of a business relationship." *Koestner v. Wease & Koestner Jewelers, Inc.,* 63 Ill.App.3d 1047, 21 Ill. Dec. 76, 79, 381 N.E.2d 11, 14 (1978). Accepting this proposition, however, does not end the inquiry since, in interpreting a contract, the substance to be ascertained is the parties' intent. *See, e.g., id.*

The evidence on intent supporting plaintiffs' literal interpretation of Section 9.1, to the effect that Dittmer would sink millions into the business, partly subsidizing plaintiffs' guaranteed income in the face of significant losses, but would only have a right to terminate the partnership if its losses were reflected directly on the partnership's books rather than on the books of a wholly owned subsidiary corporation, was less than overwhelming. It consisted of plaintiffs' restrictive, literal reading of the term "Partnership" in Section 9.1 and whatever inferences could be drawn from Dittmer's execution of the parallel notes. But at all times during the existence of the partnership Dittmer made his mandatory capital contributions to and plaintiffs received their combined management fee from the corporation even though the partnership agreement dictated that plaintiffs were to be paid by the "Partnership" and that Dittmer was to contribute to the "Partnership." The trial record is clear, and it is undisputed, that plaintiffs voiced no complaints about these practices though they are clearly incompatible with plaintiffs' partnership/corporation dichotomy. Simply put, the parties' course of conduct strongly suggested that as between themselves there was no material distinction between the subsidiary corporations and the partnership.

We do note that alternative theories supporting the wrongful dissolution claim were presented to the jury but the parties, particularly plaintiffs, devote little attention to them on this appeal. Specifically, plaintiffs claimed, despite the arguably proper attribution of the corporation's losses to the partnership, that Dittmer irrevo-cably waived, or was estopped from asserting, his right to dissolve the partnership by delaying his actions until the venture turned or was about to turn profitable. A waiver is an intentional relinquishment of a known right. *Sexton v. Smith,* 112 Ill.2d 187, 97 Ill.Dec. 411, 414, 492 N.E.2d 1284, 1287 (1986). Since it is undisputed that Dittmer did not expressly waive his rights under Section 9.1, the question is whether he impliedly did so. "To establish an implied waiver, there must be a clear, unequivocal and decisive act of a party showing such a purpose." *Washburn v. Union Nat'l Bank & Trust Co.,* 151 Ill.App.3d 21, 104 Ill.Dec. 242, 245, 502 N.E.2d 739, 742 (1986). The partnership agreement did not compel Dittmer to act on his termination rights as soon as they were triggered and it is difficult to read Dittmer's mere forbearance as an unequivocal waiver. Common sense dictates that merely by sticking with the business and infusing more capital Dittmer was not forever forfeiting his right to bail out in the face of further losses.

To establish an estoppel a plaintiff "must show that it was induced to change its position to its detriment in reliance on words or conduct amounting to a misrepresentation or concealment of material fact." *Id.,* 104 Ill.Dec. at 244, 502 N.E.2d at 741. "Estoppel arises only when a party's statement or conduct misleads another into the belief that a right will not be enforced and causes him to act to his detriment in reliance on that belief." *Old Sec. Life Ins. Co. v. Continental Ill. Nat'l Bank & Trust Co.,* 740 F.2d 1384, 1392 (7th Cir. 1984). While plaintiffs might reasonably have anticipated that Dittmer would not exercise his rights under Section 9.1 once losses were under control and revenues were steadily rising, they have not explained how they were induced to act to their detriment by his initial forbearance. Plaintiffs in their brief refer to the fact that "Dittmer continued to urge [them] to generate additional business and to invest their own time, energy and expertise ... even after the losses of the corporation were well in excess of $600,000." Plain-

tiffs' Br. at 47. But in exchange for their continued investment of time and work plaintiffs received a guaranteed annual fee of $600,000 regardless of the ultimate success of the operation.

Nonetheless, regardless of our own view of the strength of plaintiffs' case, we are obligated to view the evidence in the light most favorable to plaintiffs, without weighing conflicting evidence or judging the credibility of witnesses. Absent a complete lack of probative evidence in support of plaintiffs' theories or such an overwhelming amount of evidence in Dittmer's favor that reasonable and fair-minded jurors could only reach one conclusion, we are not entitled to substitute our own view of the evidence for that of the jury. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 684 (2d Cir.1982); *Gehrhardt v. General Motors Corp.*, 581 F.2d 7, 14 (2d Cir. 1978). Ordinarily it would be enough to say that the defendant had a full and fair opportunity to introduce opposing evidence, impeach plaintiffs' witnesses, and point out logical flaws in plaintiffs' theories.

That, however, was not the case, which leads us to Dittmer's most significant objection—that he was impermissibly handcuffed in conducting his defense by the judge's refusal to allow him to call as a witness or even mention Herb Stoller, who was plaintiffs' counsel during the negotiations that led to the partnership agreement. This issue actually evolved in stages. It first arose in January 1985, when Dittmer moved to disqualify Stoller's firm from representing plaintiffs on the ground that Stoller ought to be a trial witness. Specifically, Dittmer contended that Stoller, as principal negotiator for plaintiffs, would confirm the meaning of Sections 9.1 and 5.1 of the partnership agreement. Stoller's deposition testimony would have supported Dittmer's position on the first issue listed in the pre-trial order, which was "whether the Partnership Agreement provides that if at any time the cumulative net losses of RIF equal or exceed $600,000, Dittmer shall have the right to cause the dissolution of RIF." Based in part upon plaintiffs' representations that they did not contest Dittmer's right to terminate if losses reached $600,000, the judge denied the disqualification motion. He also ruled that Stoller's testimony about the meaning of Section 5.1 would merely be cumulative since Lamborn, Maringer, and Martin Honig were all available to testify on the point.

In June 1987, Dittmer served Stoller with a trial subpoena. In response to plaintiffs' motion to quash, Dittmer argued that the Business Form Distinction, which did not become an issue until after the original disqualification motion was denied, necessitated Stoller's testimony. Relying on his original ruling, the judge quashed the subpoena. The judge also refused Dittmer's request to charge the jury that Dittmer would have called Stoller as a witness if allowed. Finally, during the trial, the judge admonished Dittmer's counsel not to mention Stoller's name in examining witnesses or arguing to the jury, although he did say that he would not prevent any witness from testifying about Stoller.

With these rulings in place, Lamborn testified that it was Tone Grant, Dittmer's attorney, who suggested operating the partnership's business through a corporation. After Grant took the stand and swore that it was Stoller who recommended the business structure to insulate the partnership's principals from liability to third parties, plaintiffs' counsel twice suggested during cross-examination that Grant was lying. In his pre-trial deposition, however, Stoller admitted that it *was* his idea to operate the business through a corporation:

> [I]t was my request that operations be conducted through a corporation to insulate my client or clients from a three-party [*sic*] liability....
>
> ....
>
> ... The operations were conducted through a corporate subsidiary, the joint venture remained a partnership; but since the joint venture was not operational, and not likely to incur three-party [*sic*] liabilities, my request was met.

The judge's rulings, Dittmer argues, prevented the jury from hearing Stoller's admission that the business structure had no effect on the partner's rights and liabilities *inter se.* In substance, he argues that such proof would have shown that the performance of obligations and the receipt of benefits through the corporation, and the occurrence of any other relevant events through the corporation, were, as between the partners, activities of the partnership.

■ Because Dittmer's inability to call Stoller as a witness flowed from the judge's initial ruling on Dittmer's disqualification motion (and his subsequent reaffirmation of the ruling in quashing the trial subpoena), the proper focus of this appeal is on whether Stoller should at some point in the litigation have withdrawn or been forced to withdraw as trial counsel. D.R. 5–102 provides in pertinent part as follows:

(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial. . . .

(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns that or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

The test under subdivision (A) is whether the attorney's testimony could be significantly useful to his client. If so, he should be disqualified regardless of whether he will actually be called. *MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1208 (S.D.N.Y.1981). Subdivision (B) comes into play where a lawyer's testimony would contradict or undermine his client's factual assertions. *Rice v. Baron,* 456 F.Supp. 1361, 1371 (S.D.N.Y.1978). Because the courts must guard against tactical use of motions to disqualify counsel, *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979), they are subject to fairly strict scrutiny, particularly motions under subdivision (B):

For testimony to be "prejudicial" within the meaning of the disciplinary rule, the "projected testimony of a lawyer or firm member must be sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." [*Freeman v. Kulicke & Soffa Indus., Inc.,* 449 F.Supp. 974, 977 (E.D.Pa.1978), *aff'd mem.,* 591 F.2d 1334 (3d Cir.1979)]. *See also Nakasian v. Incontrade, Inc.,* 78 F.R.D. 229, 232 (S.D.N.Y.1978) (Lasker, J.). Furthermore, the moving party "bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial." *Freeman,* 449 F.Supp. at 978; *see Kroungold v. Triester,* [521 F.2d 763, 766 (3d Cir.1975)]; *Ross v. Great Atlantic & Pacific Tea Co.,* [447 F.Supp. 406, 408 (S.D.N.Y.1978)].

*Rice,* 456 F.Supp. at 1371. After carefully reviewing the record, we are convinced that Stoller's testimony would likely have been materially prejudicial to his clients and thus that he should have been disqualified.

First, Stoller was one of the principal architects of the partnership agreement, initially representing Lamborn but ultimately, according to his own deposition testimony, representing both Lamborn and Maringer. Among other things, Stoller admitted that he conceived the idea of running the business through corporations, the purpose of which, his deposition strongly suggested, was limited to insulating the principals from liability. If nothing else, his testimony on this point would have damaged Lamborn's credibility. His deposition testimony also intimated that the intent of the parties in incorporating Section 9.1 into the agreement was to give Dittmer an out if the business' losses—his losses really—reached a certain level, not simply if those losses were reflected on the books of the subsidiary corporation as opposed to those of the partnership:

[H]e [Tone Grant] wanted the partnership arrangement to have a provision that would permit Mr. Dittmer, if *his* losses reached a certain level, I believe the amount was $600,000, that Mr. Dittmer would have the right to terminate the arrangement.

....

He [Tone Grant] said he recommended [sic] that *the losses Mr. Dittmer might have to bear* might be in excess of $600,-000, but he wanted the technical right to terminate the partnership if it reached the amount, and that was the amount that was discussed and decided upon....

(emphasis added). The artificial nature of the corporate/partnership structure is also strongly suggested in a letter written by Stoller to Dittmer right after Dittmer informed plaintiffs that he was terminating the partnership:

Lamar hereby demands an immediate accounting of the assets, liabilities, income and expenses of the *Partnership* from its inception to date....

... Lamar will hold you responsible for any damage to the Partnership which may result or has already resulted from your failure to observe your fiduciary responsibilities, including any efforts on your part to hire *Partnership* personnel, to solicit *Partnership* customers, to alienate Lamar from its management rights and obligations or otherwise to interfere with *the ongoing business of the Partnership.*

(emphasis added). While the materiality of Stoller's testimony was not obvious when the initial disqualification motion was filed, it became so as the case progressed, and was certainly clear after plaintiffs moved to amend the complaint on the eve of trial and elicited testimony during the trial that would have likely been contradicted by Stoller.

In quashing the subpoena, the judge stood by his original ruling on the disqualification motion, stating:

I have ruled that he is not an essential witness, that any information needed in terms of him can be secured from other witnesses. I stand on that ruling. I see no reason for me to change it.

The difficulty with the trial court's ruling is twofold. First, the court had earlier determined that Stoller's testimony was cumulative only as to the meaning of Section 5.1 of the partnership agreement, not Section 9.1. Second, in referring to the earlier decision, the court implied that the basis for seeking Stoller's testimony had not changed. Yet the court recognized elsewhere, and properly so, that the parties' "theories [had] changed almost completely from the time [they] started." Having concluded that the earlier rulings adequately addressed Dittmer's declared need for Stoller's testimony, the court failed to consider the materiality of that testimony in light of the Business Form Distinction. Because of the changed complexion of the case at the time of trial and the arguable weaknesses in plaintiffs' theories, any admission elicited from Stoller on the stand, or the impeachment value of his deposition testimony if no admissions were forthcoming, might well have altered the outcome of the case. In light of this conclusion, it will be necessary on remand for the district court to reconsider the application to disqualify Stoller's firm.

■ Dittmer raises one other objection on appeal that merits comment. Along with a variety of other attacks on the damage portion of the trial, he complains that the jury was permitted to base its award on the impermissibly speculative and flawed testimony of plaintiffs' expert, Kenneth McGraw. Given RIF's disastrous net losses ($2.9 million), its brief track record, and the expert's inability to find substantially similar businesses to gauge future performance, the expert's testimony was "nothing more than conjecture," according to Dittmer. Appellant's Brief at 61. We disagree.

In considering the sufficiency of damage evidence, we are guided by the following well-established principles:

[W]hen the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages. *See*

*Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 456 (2d Cir.1977); *W.L. Hailey & Co. v. County of Niagara,* 388 F.2d 746, 753 (2d Cir.1967) (collecting New York cases). Moreover, the burden of uncertainty as to the amount of damage is upon the wrongdoer, *Perma Research & Dev. v. Singer, supra,* 542 F.2d [111] at 116 [2d Cir.1976] and the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount. *Duane Jones Co. v. Burke,* 306 N.Y. 172, 192, 117 N.E.2d 237, 247–48 (1954).

*Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir. 1977). Flexibility in permitting proof of damages is particularly appropriate where, as here, it is the defendant's allegedly wrongful conduct that frustrates more precise calculations. *See Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770, 779 (S.D.N.Y.1984), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985); *Sarlie v. E.L. Bruce Co.,* 265 F.Supp. 371, 375–76 (S.D.N.Y. 1967).

With regard to the initial question of whether plaintiffs proved the fact of damages, we reject outright the suggestion in Dittmer's papers that a business with no history of profits is necessarily valueless. *See Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556 (2d Cir.1970). McGraw's projections were, on balance, sufficiently sound with respect to the fact of damages. The record reveals that he carefully laid out the factors that influenced his projections. As a general matter, he observed that the commodities business, while often involving complex transactions, is relatively simple and susceptible to fairly reliable projections of future performance. He studied the partnership's financial statements including, of course, those of the subsidiary corporations; he studied the development and growth of the partnership's business as well as trends in the securities and commodities industry generally; and he studied prices paid for companies in the financial services area. Of principal importance, he noted that in the last 6 months of the partnership—after plaintiffs established the business' infrastructure and retained a clientele base—there was a rapid growth in revenues. Commission income increased by about 102% from January to March of 1983. Although the parties dispute whether the business actually turned a profit in its last month of existence, the evidence supported McGraw's opinion that the business was about to break into an extended period of profitability.

We also find no fault with McGraw's methodology in estimating the value of the business. First, based upon the 6–month upward trend and plaintiffs' own projections, he estimated that the business' gross revenues in 1984 could have reached $25 million. Since the value of a business ordinarily relates to net income and not revenue, McGraw explained that it was necessary to estimate the profit margin on future revenues. After reviewing Refco's own profit margin, profit margins in the securities business as a whole including companies involved exclusively or in part in commodities trading,[5] and plaintiffs' own projections, McGraw concluded that net profits would have been 20% of gross revenues before subtracting Lamar's compensation and taxes. After computing and applying the appropriate deductions, McGraw concluded that net income for 1984 would have been $2.4 million. He then estimated, based on a review of the price/earnings ratio of 4 publicly traded companies with substantial activity in commodities, that a willing buyer would have purchased the business at the time the partnership was dissolved for 14.4 times the anticipated net earnings for 1984, plus an additional control premium of 37%. Adopting this analysis led to a fair market value of approximately $47,350,000. To calculate the business' fair market value at the time of trial, McGraw factored in a 6% annual increase in volume which corresponded roughly to the growth in the num-

5. Profit margins in the studied companies ranged from 6 to 30%.

ber of industry-wide commodities contracts written between 1984 and 1987.[6]

Dittmer's main objection to McGraw's figures seems to be that he relied, in making certain key calculations, on the performance of companies that were much larger than or in some cases significantly different from RIF. But McGraw testified that in researching price/earnings ratios he could not find companies dealing exclusively in commodities trading and that in calculating profit margins it was impractical to isolate companies in the commodities business. The data relied upon, as McGraw testified in substance, was the best evidence reasonably available; no more was required of him. *See Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 541 (10th Cir.1987).

Had there been evidence that other companies closer in size and nature were available for comparison and, more significantly, that the use of data on dissimilar companies substantially inflated RIF's performance prospects, our view of the adequacy of McGraw's testimony might be different. No such evidence was introduced. As it stands, perhaps McGraw's projections were highly optimistic in the face of RIF's brief, modest performance, but McGraw's analysis was a far cry from the testimony in the cases cited by Dittmer in which the damage projections were either materially contradicted by the evidence or based on patently unsound assumptions. *See, e.g., Park v. El Paso Bd. of Realtors,* 764 F.2d 1053 (5th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986); *Klapmeier v. Telecheck Int'l, Inc.,* 482 F.2d 247 (8th Cir.1973); *Herman Schwabe, Inc. v. United Shoe Mach. Corp.,* 297 F.2d 906 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

Accordingly, the judgment is reversed and the case is remanded for a new trial, at which Stoller shall be permitted to testify, if called by defendants. Prior to the new trial, the district court shall reconsider the motion to disqualify Stoller's law firm in light of our determination that his testimony will be necessary.

---

**6.** It appears that McGraw made a mathematical error in projecting 1987 revenues based on his 6% annual growth assumption. It is unnecessary here to determine the correct figure.