KNIGHTSBRIDGE MARKETING SER-
VICES, INC., Plaintiff, Appellee,

v.

PROMOCIONES Y PROYECTOS, S.A.
"Cuenta" Hotel Plaza Dominicana,
etc., Defendant, Appellant.

No. 83–1668.

United States Court of Appeals,
First Circuit.

Argued Jan. 3, 1984.

Decided March 6, 1984.

Patricia G. Curtin, Boston, Mass., with whom Alan R. Hoffman, M. Eric Schoenberg, Washington, D.C., and Lynch, Brewer, Hoffman & Sands, Boston, Mass., were on brief, for defendant, appellant.

Gerald A. Rosenthal, Boston, Mass., with whom William A. Zucker, and Gadsby & Hannah, Boston, Mass., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This appeal arises out of a breach of contract action brought by plaintiff-appellee Knightsbridge Marketing Services, Inc. (hereinafter KMS) against defendant-appellant Promociones Y Proyectos, S.A. (hereinafter PYP), a Dominican Republic corporation. Under the contract, KMS agreed to serve as a North American sales representative and reservations agent for the Plaza Dominicana, a hotel operated by PYP in Santo Domingo. In district court the parties stipulated as to PYP's liability and to certain liquidated amounts due and owing under the contract. The only issue contested was the amount of commissions lost by KMS under the breached agreement. After a bench trial, the district court awarded KMS $135,661 for lost commissions. PYP appeals contending the trial court erred in basing its award on highly speculative evidence of lost commissions and disregarding the past commission earnings of the parties, and in admitting the testimony of KMS's two expert witnesses to establish the amount of lost commissions.

## I.

A statement of the proceedings leading to this appeal is appropriate. In September 1980, KMS brought a breach of contract action against PYP in federal court. After extended negotiations between PYP and KMS, a settlement was reached in April 1981. The settlement agreement provided for PYP to pay KMS all liquidated amounts then due and owing, and for both parties to enter into an amended agreement covering KMS's continued representation of the Plaza Dominicana. The amended agreement required PYP to perform the following duties: to identify KMS as a sales representative on all advertising and promotional materials; to supply KMS with fact sheets, lists of tariffs, descriptive brochures and other promotional materials; and to notify KMS of room availability and rate changes. In spite of the settlement agreement and renewed promises to perform, PYP, after a

short period of compliance, failed to fulfill its obligations under the settlement and amended agreements. KMS moved in December 1981 to have the case reopened and filed an amended complaint asking payment of the unpaid liquidated amounts due under the settlement agreement and damages for breach of the amended agreement.

During pretrial discovery, KMS served interrogatories and documentary requests on PYP asking for financial data and records which would disclose the amount of revenue the Plaza Dominicana derived from North America during the last half of the initial agreement and the entire fifteen-month period of the amended agreement. This information would have provided an accurate base for a determination of KMS's lost commissions. After PYP failed to answer the interrogatories, it was ordered to do so by the court. PYP complied by filing answers in Spanish which did not answer the questions asked and provided virtually no information as to the hotel's revenue from North America during the relevant time periods. PYP subsequently filed supplemental answers, but these were vague and internally inconsistent. The revenue that PYP derived from North America remained unstated and, as far as KMS was concerned, unknown.

At trial, KMS used two expert witnesses to prove the amount of the lost commissions. The basic testimony was by Gary Dischel, president of KMS. It was his opinion that the commissions lost due to PYP's breach of the amended contract approximated $135,000. Dischel's opinion was based on his own personal knowledge and experience with the hotel industry in Santo Domingo and the Dominican Republic, information supplied him by defendant as to the operations of the Plaza Dominicana in 1979 and information obtained from the Tourist Board of the Dominican Republic. He arrived at the $135,000 figure as follows. First, an estimate of the annual revenue of the Plaza Dominicana was made. This was reached by taking into account the number of rooms in the hotel available for rent, the average annual room rent, and the average annual occupancy rates. The annual reve-

nue was then adjusted to reflect the total fifteen-month period covered by the agreement and this was reduced by forty percent to account for business from outside North America. The total North American revenue was further reduced by twenty-five percent to account for reservations that, under the nonexclusive nature of the contract, would have been made other than through KMS. From this commission base, Dischel applied a commission rate of six percent, reflecting the average commission KMS earned under the contract's five to ten percent commission structure. The commission rate was not disputed.

Dischel's opinion of the amount of lost commissions was supported by the testimony of Hugh S. Stevens. Stevens, a marketing and consulting manager for several hotels located in the Dominican Republic, and experienced in monitoring the competitive Santo Domingo hotel market, testified that Mr. Dischel's computations were "reasonable and accurate and, if anything, they were on the low side." He further opined that a commission of $135,000 would be reasonable for the type of services KMS would perform for a hotel like the Plaza Dominicana.

PYP presented no witnesses to rebut Dischel's calculations. And most significantly, in light of its refusal to answer the pretrial interrogatories, it introduced no revenue records of its own to refute the estimates Dischel used in arriving at his amount of $135,000 in lost commissions. PYP's defense was limited to cross-examination of plaintiff's two experts. It brought out in cross-examination of Dischel that the actual commissions earned by KMS between September 1979 and May 1981 was $8,720. Dischel attributed these low earnings to three factors. First, during this twenty-month period PYP stymied KMS's efforts by entering into another and similar contract with a rival company. Second, a major hurricane greatly damaged the hotel in the fall of 1980 and it was unable to rebuild in time to take advantage of the tourist season in the fall, winter and spring of 1980–1981. Third, a rumored typhoid epidemic in Santo

Domingo during the peak of the 1980 tourist season further depressed revenue.

## II.

The first issue is whether the district court erred in finding that the lost commissions amounted to $135,166. There are two answers to appellant's claim that the evidence was highly speculative. First, we agree with the district court that the "wholly credible testimony of Dischel and Stevens ... the estimates used, and the methods of calculation employed, were fair and reasonably accurate." Second, it ill behooves PYP to complain about speculative evidence when it has admitted liability and refused to furnish the information that could have eliminated or greatly reduced any speculation. *See Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Management, Inc.,* 519 F.2d 634, 642–43 (8th Cir.1975). The district court was entitled, as are we, to draw an adverse inference against the defendant for its failure to produce either pretrial or at trial its earnings figures for 1981 and 1982.

When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him. Wigmore has asserted that nonproduction is not merely "some" evidence, but is sufficient by itself to support an adverse inference even if no other evidence for the inference exists:

The failure or refusal to produce a relevant document, or the destruction of it, is evidence *from which alone* its contents may be inferred to be unfavorable to the possessor, provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference.

2 *Wigmore on Evidence* § 291, at 228 (Chadbourn rev. 1979) (emphasis added).

The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them.

*Nation-Wide Check Corporation, Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217–18 (1st Cir.1982).

The next question is whether the district court erred in basing its decision on expert testimony instead of the past earnings record of the parties. Under Massachusetts law, lost profits are a proper element of recovery in an action for breach of contract and may be recovered

where it appears that the loss was the natural, primary and probable consequence of the breach, that the profits arising from the performance of the contract or the loss likely to result from its nonperformance were within the contemplation of the parties, and that the profits are not so uncertain or contingent as to be incapable of reasonable proof.

*Gagnon v. Sperry & Hutchinson Co.,* 206 Mass. 547, 92 N.E. 761, 763 (1910). Recovery of lost profits is predicated, of course, on the principle that an injured party is to be placed in the same position he would have been in had the contract been performed. *John Hetherington & Sons v. William Firth Co.,* 210 Mass. 8, 95 N.E. 961, 964 (1911). The prospective profits need not be proved with mathematical accuracy, *Rombola v. Cosindas,* 351 Mass. 382, 220 N.E.2d 919, 922 (1966); the plaintiff need only show "by reasonable proof that he has lost profits." *Gagnon,* 92 N.E. at 763.

Appellant accepts, as it must, these basics of Massachusetts law, but asserts that where an existing earnings record exists it should be used and that expert testimony is appropriate in the determination of lost profits only if such testimony has a foundation in the actual earnings record. We think this misapprehends Massachusetts law. Evidence of an established earnings record may, of course, in many cases be the best evidence on which to prove profits with reasonable certainty, but it is by no means exclusive. All that is required is a reasona-

ble basis of computation and the best evidence obtainable. *Agoos Leather Companies v. American Foreign Insurance Co.,* 342 Mass. 603, 174 N.E.2d 652, 655 (1961). Expert testimony alone has been explicitly recognized as a method of proving prospective damages. *City Welding and Manufacturing Co. v. Gidley-Eschenheimer Corporation,* 16 Mass.App. 372, 451 N.E.2d 734, 736 (1983).

Appellant has stretched and distorted the holding of the case on which it principally relies. In *Narragansett Amusement Co. v. Riverside P. Amusement Co.,* 260 Mass. 265, 157 N.E. 532 (1912), recovery of lost profits was denied plaintiff who was prevented from running a "side show" at defendant's amusement park. The court found that the profits claimed were "too conjectural and uncertain to be recovered." *Id.* at 536. This finding was based on the fact that the type of entertainment to be given by plaintiff had "never been given in Springfield or any other place in this commonwealth." *Id.* This is a far cry from establishing a rule that historical earnings records must be used in calculating loss of prospective profits.

In the instant case compelling reasons were given for disregarding the historical earnings record. The calculation of loss of commissions was based on the best evidence obtainable—records and well-founded estimates of the amount and source of the defendant's hotel revenue. Both experts had a thorough knowledge of the hotel business generally and specifically in the Dominican Republic. This was not a case of extrapolating experience, data, and knowledge from one area to another. The district court's finding of the amount of lost commissions comported fully with Massachusetts law.

### III.

■ As already indicated, we are not impressed with appellant's argument that the expert testimony was improperly admitted. Both witnesses met the requirements of Federal Rule of Evidence 702.[1] Each qualified as an expert by reason of knowledge, experience, training, and education.

■ Nor do we think that Dischel's testimony failed to comply with the requirements of Federal Rule of Evidence 703.[2] Appellant's characterization of the testimony as being based wholly on hearsay and a mere summary of data to which multiplication tables were applied is simply not correct. Dischel's testimony was based on a combination of his own personal knowledge and experience in the hotel-booking business, facts and information obtained from dealing directly with defendant's hotel, and authoritative sources in Santo Domingo and the Dominican Republic. As a qualified expert, Stevens had the right to put his imprimatur on Dischel's testimony. The way to combat such evidence is by cross-examination, not claiming foul.

Appellant's claim that it was prevented effectively from cross-examining Dischel because his testimony was merely a summary of hearsay information borders on the frivolous. Appellant had available two methods for combatting Dischel's testimony, the substance of which had been made available to PYP in affidavit form at least three and one-half months prior to trial. It could have submitted the actual revenue records of the hotel and it could have called its own expert witnesses. Appellant either did not have the ammunition to mount an

1. **Rule 702. Testimony by Experts**
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

2. **Rule 703. Bases of Opinion Testimony by Experts**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

effective defense or chose not to use it. In either case, the fault lay with PYP, not with the court.

*Affirmed.*