19 F.3d 1429
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In re: LONE STAR INDUSTRIES, INC. Concrete Railroad Cross
Ties Litigation
CSX TRANSPORTATION, INCORPORATED; National Railroad
Passenger Corporation; Metro-North Commuter
Railroad Company; Massachusetts Bay
Transportation Authority, Plaintiffs,
v.
LONE STAR INDUSTRIES, INCORPORATED; Lone Star
Transportation Corporation; San-Vel Concrete
Corporation, Defendant & Third Party
Plaintiff-Appellants,
v.
Lafarge Corporation; Lafarge Canada, Inc., Third Party
Defendants-Appellees
and
Northeast Cement Company, Incorporated; the Thompson &
Lichtner Company, Incorporated, Third Party Defendants.
In re: LONE STAR INDUSTRIES, INC. Concrete Railroad Cross
Ties Litigation
CSX TRANSPORTATION, INCORPORATED; National Railroad
Passenger Corporation; Metro-North Commuter
Railroad Company; Massachusetts Bay
Transportation Authority, Plaintiffs,
v.
LONE STAR INDUSTRIES, INCORPORATED; Lone Star
Transportation Corporation; San-Vel Concrete
Corporation, Defendant & Third Party
Plaintiff-Appellants,
v.
Lafarge Corporation; Lafarge Canada, Inc., Third Party
Defendants-Appellees
and
Northeast Cement Company, Incorporated; the Thompson &
Lichtner Company, Incorporated, Third Party Defendants.
 Nos. 93-1505, 93-1506.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 8, 1993.
Decided April 7, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Alexander Harvey II, Senior District Judge. (CA-89-2005-H, CA-89-3085-H, CA-90-748-H, CA-90-1741-H, CA-89-3343-H)
 Andrew Jay Graham, Kramon & Graham, P.A., Baltimore, Md., for appellants.
 Lawrence T. Hoyle, Jr., Hoyle, Morris & Kerr, Philadelphia, Pa., for appellees.
 On Brief: Rogers & Wells, New York, New York, for appellants.
 Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, Pa., for appellees.
 D.Md.
 VACATED, REVERSED, AND REMANDED.
 Before HALL, LUTTIG, and MICHAEL, Circuit Judges.
 OPINION
 MICHAEL, Circuit Judge:
 
 I. Introduction
 
 1
 In this diversity action, Lone Star Industries, Inc., Lone Star Transportation Corporation and San-Vel Concrete Corporation (collectively "Lone Star") sued Lafarge Corporation and Lafarge Canada, Inc. (collectively "Lafarge") for claims arising out of Lafarge's sale of cement to Lone Star. After a five-week jury trial, the $1.2 million verdict for Lone Star was but a small fraction of the $93 million it had sought. Lone Star appeals and Lafarge cross appeals certain rulings of the district court during the course of the litigation.
 
 
 2
 Lone Star asserts that the district court erred in (1) determining that Lone Star abandoned $83 million in consequential damage claims, (2) denying Lone Star leave to amend its complaint and third-party complaints, (3) granting Lafarge judgment as a matter of law on Lone Star's damage claims for lost future profits and asset write-offs, and (4) ruling that any fault on Lone Star's part precluded its recovery for common-law indemnification. For the reasons discussed below, we vacate the judgment of the district court and remand for a new trial on both liability and damages. With this disposition, we need not address the issues raised in Lone Star's fourth assignment of error or in Lafarge's cross appeal.
 
 
 3
 II. Some Background Pertinent to the Abandonment Issue
 
 
 4
 Between 1983 and 1988, Lafarge sold cement to Lone Star which Lone Star used in manufacturing over 500,000 concrete railroad crossties. The ties were bought by several railroads, including Amtrak, and were installed throughout the Eastern United States. In 1988 and 1989, several railroads notified Lone Star that the ties were showing signs of premature, severe cracking and required replacement. Lone Star claimed that the cracking was due to Lafarge's defective, over-sulfated cement. In 1989, the railroads began suing Lone Star in various federal courts, including the Districts of Maryland, Massachusetts and Southern New York. In these actions, Lone Star filed third-party complaints against Lafarge, asserting claims for breaches of express and implied warranties, negligence, and fraudulent misrepresentation (the "non-indemnification claims"). Lone Star also commenced a separate action against Lafarge in the District of Maryland. The Judicial Panel on Multidistrict Litigation consolidated all of these actions in the District of Maryland pursuant to 28 U.S.C. Sec. 1407.
 
 
 5
 Lone Star's amended third-party complaint sought damages from Lafarge on each of the non-indemnification (warranty, negligence and fraud) claims for, inter alia, "the full amount of any judgment rendered herein [for the railroads against Lone Star], as well as for related costs and expenses." JA 106, 108-10, 113-14. Shortly before trial, Lone Star settled the railroads' claims for $67.1 million.
 
 
 6
 In early September 1992, pursuant to Local Rule 106, Rules of the U.S. District Court for the District of Maryland ("Local Rule"), Lone Star submitted a proposed pretrial order covering its claims against Lafarge. In the pretrial order, a party must identify "[a]ny issue in the pleadings that is to be abandoned." Md. Dist. Ct. R. 106(2)(e). "None" was Lone Star's response. JA 250.
 
 
 7
 In the pretrial order, Lone Star listed its separate legal theories, i.e., the non-indemnification claims, as follows:
 
 
 8
 Lone Star will maintain the following claims against Lafarge at trial:
 
 
 9
 . that Lafarge breached its express warranty that the cement would comply with ASTM specification C150;[1]
 
 
 10
 . that Lafarge breached its implied warranty of merchantability and fitness for a particular purpose;
 
 
 11
 . that Lafarge was negligent in the manufacture of the cement in question; and
 
 
 12
 . that Lafarge falsely represented that the cement which it sold to Lone Star complied with ASTM specifications, either knowing such representations to be false, or with reckless disregard as to their truth or falsity.
 
 
 13
 JA 250 (emphasis added). In describing the details of its damages Lone Star said:
 
 
 14
 Lone Star will also prove that, as a result of Lafarge's failure to comply with its warranties and contractual commitments, Lafarge is liable to indemnify Lone Star with respect to the claims of the plaintiff railroads. In addition, Lone Star has sustained damages through the destruction of its concrete railroad ties business, related closing costs and asset write-offs, lost profits, litigation fees and expenses, and reorganization costs.... Additional costs and damages are continuing to accrue.
 
 
 15
 JA 250.
 
 
 16
 Lone Star repeated the foregoing statements in an amended pretrial order submitted in late September 1992. The district court approved the two pretrial orders on September 10 and October 1, 1992, respectively.
 
 
 17
 At the district court's request, Lone Star filed a supplemental pretrial order on November 9, 1992, with an attachment describing and updating damages sought as follows:
 
 DAMAGES CLAIMED AGAINST LAFARGE
 
 18
 As of September 30, 1992, the components of Lone Star's damage claims were as follows:
 
 Direct Costs ($000 )
 Litigation fees and expenses $15,757
 Interest on Professional Fees 300
 Related Asset Write-offs 1,727
 San-Vel Closing Costs 1,300
 Reorganization Costs 4,217
 Direct Lost Profits 1,213
 Future Lost Profits 1,800
 
 19
 $26,314
 
 Indemnification ($000 )
 Amtrak $39,000
 Metro-North 3,000
 CSX Transportation 3,400
 U.S. Navy/Railroad Service 85
 LSM Concrete Tie Company 419
 Mass. Bay. Trans. Authority 15,500
 Maryland MTA 5,700
 
 20
 $67,104
 
 TOTAL:$93,418
 
 21
 JA 362 (emphasis added).
 
 
 22
 Trial commenced on November 9, 1992. While Lone Star was still presenting its case, the parties filed their proposed jury instructions. Lone Star's proposed instructions discussed in detail the elements of its non-indemnification claims as well as its common-law indemnification claim. In a proposed damage instruction, Lone Star made clear that it "claim[ed] the same damages with respect to each of its theories of recovery." JA 414. Damages listed in the instruction included railroad settlement costs and litigation fees, expenses, and interest ("settlement costs and litigation expenses"). During Lafarge's case, Lone Star filed revised instructions which reiterated that the settlement costs and litigation expenses were sought on each theory of recovery.
 
 
 23
 Lafarge argues, and the district court agreed, that exchanges during trial between the district court and one of Lone Star's counsel establish that Lone Star had decided to seek recovery of settlement costs and litigation expenses only under the common-law indemnification claim. The first exchange occurred after the close of Lone Star's case:
 
 
 24
 THE COURT: And then you talk about contribution. I hadn't heard any mention of contribution in this case. I thought it was strictly indemnification.
 
 
 25
 MR. QUINLAN [for Lone Star]: I believe that is correct, your Honor.
 
 
 26
 THE COURT: There were some references in the instructions to contribution which is a slightly different theory and I don't think it's mentioned in opening statements and nor in the pretrial order claim. All right. So I think we're agreed, then, with what the five claims are and it's the--indemnification and I think we're also agreed that it is Massachusetts law. Everybody agrees that it is Massachusetts law. And when we get to instructions, we will be discussing that in more detail.
 
 
 27
 JA 1054.
 
 
 28
 The second exchange occurred during Lafarge's case:
 
 
 29
 THE COURT: Because there are different considerations and they are being charged separately on each of those elements. Of course, the indemnification, seems to me that would be the first thing because that is where you get your claims form [sic] amounts paid in settlement and attorneys fees and so on and there are elements there that you have to prove, plus you have the indemnification plus the wrongful act, correct?
 
 
 30
 MR. QUINLAN: I believe that is correct, your Honor.
 
 
 31
 THE COURT: It wasn't really set up that way, and, of course, if the jury found for Lafarge on indemnification, that wipes those claims out, whether or not you prove the others, correct?
 
 
 32
 MR. QUINLAN: I am at something of a disadvantage, your Honor, because my colleagues working on this are not here, but I believe that may be correct.
 
 
 33
 JA 1153-54.
 
 
 34
 At the conclusion of Lafarge's case, the district court conducted the customary charge conference. At the conference, the court indicated that Lone Star, in its pretrial order materials, had abandoned any claim for settlement costs and litigation expenses, except under the common-law indemnification theory. Lone Star's repeated objections to this determination were overruled. Therefore, Lone Star could recover settlement costs and litigation expenses (alleged to total $83 million) only if the jury found for Lone Star on the common-law indemnification claim. Lone Star's potential to collect damages on its non-indemnification claims (breach of warranties, negligence and fraud) would be limited to $1,213,000, the amount sought for direct lost profits.
 
 
 35
 The jury returned its verdict in favor of Lone Star on all but the common-law indemnification and breach of implied warranty of merchantability claims. Thus, the jury found that Lafarge acted fraudulently, negligently, and contrary to certain warranties. However, because of the district court's abandonment determination, Lone Star was denied the potential recovery of $83 million in settlement costs and litigation expenses under the non-indemnification claims. Lone Star was awarded $1,213,000 in consequential damages for direct lost profits.
 
 
 36
 At the post-trial motion stage, the district court reaffirmed its conclusion that Lone Star (to avoid potential statutes of limitations problems) had dropped its consequential damage claims for settlement costs and litigation expenses prior to trial. Specifically, the district court said that "Lone Star had for tactical reasons limited its claim for the recovery of settlement amounts paid and litigation expenses to one asserted solely under a theory of [common-law] indemnification...." JA 581. The district court cited the following to justify its conclusion: (1) Lone Star's use of the word "indemnify" in one paragraph discussing damages in its pretrial orders, (2) Lone Star's use of the word "indemnify" in narrative introducing a partial listing of its damages in an attachment to the pretrial order, (3) Lone Star's use of the words "Direct Costs" and "Indemnification" as headings in an attachment listing the components of its damages in the supplemental pretrial order set out above, and (4) the two brief exchanges with Lone Star's counsel, also set out above. We believe that the district court focused too much on the places where the words "indemnify" or "indemnification" were used and missed the broader picture. That broader picture (which includes other parts of the pretrial order material, Lone Star's proposed instructions and an analysis of the key colloquies) compels the conclusion that Lone Star was seeking settlement costs and litigation expenses under all theories of recovery, not just common-law indemnification.
 
 III. Analysis of the Abandonment Issue
 
 37
 Lone Star contends the district court erred in determining that Lone Star had abandoned settlement costs and litigation expenses as damage elements under its non-indemnification claims.[2] We review the district court's determination, at both the trial and post-trial motion stages, under an abuse of discretion standard. See, e.g., Trujillo v. Uniroyal Corp., 608 F.2d 815, 817-18 (10th Cir.1979) (citation omitted); Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir.1985), cert. denied, 475 U.S. 1016 (1986).
 
 
 38
 In finding abandonment, the district court relied mainly on Lone Star's pretrial order materials and two of the court's exchanges with Lone Star's counsel during trial. In our review, we examine these materials and exchanges as well as certain other portions of the record.
 
 A. The Pretrial Order Materials
 
 39
 Federal Rule of Civil Procedure 16(e) and Local Rule 106(1) provide for the entry of a pretrial order. Generally, pretrial orders are construed " 'liberally ... to cover any of the legal or factual theories that might be embraced by their language.' " Trujillo, 608 F.2d at 818 (citation omitted); Lamborn v. Dittmer, 873 F.2d 522, 527 (2nd Cir.1989) (dicta); Miller v. Safeco Title Ins. Co., 758 F.2d 364, 368 (9th Cir.1985); Howard v. Kerr Glass Mfg. Co., 699 F.2d 330, 333 (6th Cir.1983) (dicta); United States Gypsum Co. v. Schiavo Bros., Inc., 668 F.2d 172, 181 n. 12 (3rd Cir.1981), cert. denied, 456 U.S. 961 (1982); Geremia v. First Nat'l Bank of Boston, 653 F.2d 1, 5 (1st Cir.1981); see Scutieri v. Paige, 808 F.2d 785, 792 (11th Cir.1987); 6A Charles A. Wright et al., Federal Practice and Procedure Sec. 1527 (2d ed.1990). We echo the view of the Tenth Circuit:
 
 
 40
 Any other [than a liberal] construction of the pre-trial order would tend to unduly constrict the trial of the case and defeat the central and salutary purpose of the Federal Rules of Civil Procedure to insure the trial of every lawsuit on its merits.... It is a procedural tool to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality. We must not allow ourselves to construe the pre-trial order in the spirit of a common law pleading.
 
 
 41
 Century Ref. Co. v. Hall, 316 F.2d 15, 20 (10th Cir.1963) (emphasis added).
 
 
 42
 Even if construction of the pretrial order material is necessary, the district court's abandonment conclusion went beyond the normally broad discretion accorded a trial judge in this context. First, Lone Star's amended third-party complaint sought damages on each of the non-indemnification claims for "the full amount of any judgment rendered herein [for the railroads], as well as for related costs and expenses." When required under Local Rule 106(2)(e) to state (in the pretrial order) what pleading issues were being abandoned, Lone Star responded "none." Second, the pretrial order sets forth the five nonindemnification claims and then clearly states that all of the claims are based on a preceding factual narrative which includes a discussion of the railroad settlement costs and litigation expenses. Third, both sets of Lone Star's jury instructions state directly that "Lone Star claims the same damages with respect to each of its theories of recovery." JA 414, 489. These damages are then set forth with particularity and include the settlement costs and litigation expenses.
 
 
 43
 The district court emphasized Lone Star's use of the words "indemnify" twice and "indemnification" once in the pretrial order materials. A look at how these words were used does not support the abandonment determination. Read in context, "indemnify" and "indemnification" refer to a category of damages rather than a distinct legal claim.
 
 
 44
 We believe the district court's failure to distinguish between the claims pursued and damages sought helped lead to the erroneous determination. This failure to distinguish is highlighted in the March 26, 1993, Memorandum and Order denying the post-trial motions. For instance, in interpreting the "Direct Costs" and "Indemnification" headings in the attachment to the supplemental pretrial order, the district court said:
 
 
 45
 Both the Court and counsel for Lafarge interpreted Lone Star's original and supplemental Pretrial Orders as presenting only two basic theories of recovery, first a claim of indemnification and second a direct claim for the recovery of certain other consequential damages.
 
 
 46
 JA 583-84 (emphasis added).
 
 
 47
 The record does not support the characterization of "Direct Costs" as a "basic theor[y] of recovery." Lone Star repeatedly emphasized in its pleadings and other submissions that its theories of recovery consisted only of the non-indemnification claims and the common-law indemnification claim. An examination of the pretrial order attachment which had the "Direct Costs" and "Indemnification" headings reveals that they were not meant to characterize legal theories. Indeed, the headings were introduced as "the components of Lone Star's damage claims." See, e.g., JA 362 (emphasis added). Lone Star's legal theories were discussed elsewhere.
 
 
 48
 The settlement costs and litigation expenses were preserved in the pretrial order materials as part of the consequential damages sought under the five non-indemnification claims.
 
 
 49
 B. The District Court's Exchanges with Counsel
 
 
 50
 In addition to the pretrial order material, the district court relied on two exchanges with counsel for Lone Star to reach its abandonment determination. We set out the exchanges in the background discussion, and they are worth repeating here. The first (after Lone Star had rested) was:
 
 
 51
 THE COURT: And then you talk about contribution. I hadn't heard any mention of contribution in this case. I thought it was strictly indemnification.
 
 
 52
 MR. QUINLAN: I believe that is correct, your Honor.
 
 
 53
 THE COURT: There were some references in the instructions to contribution which is a slightly different theory and I don't think it's mentioned in opening statements and nor in the pretrial order claim. All right. So I think we're agreed, then, with what the five claims are and it's the--indemnification and I think we're also agreed that it is Massachusetts law. Everybody agrees that it is Massachusetts law. And when we get to instructions, we will be discussing that in more detail.
 
 
 54
 (Emphasis added.)
 
 
 55
 Lone Star counsel's agreement with the district court is hardly surprising. His response simply indicates that as between contribution and indemnification, Lone Star determined the better course was to pursue indemnification. This position was entirely consistent with the representations made in Lone Star's pretrial order. Additionally, the underscored portion of the district court's follow-up buttresses Lone Star's assertion that it was surprised when the court subsequently announced its conclusion that Lone Star was pursuing only two basic theories of recovery. The underscored portion is also consistent with Lone Star's proposed jury instructions asserting the nonindemnification claims and one common-law indemnification claim. Accordingly, this first exchange does not support the abandonment determination.
 
 
 56
 The second exchange occurred during Lafarge's case when proposed written interrogatories to the jury were being discussed:
 
 
 57
 THE COURT: Because there are different considerations and they are being charged separately on each of those elements. Of course, the indemnification, seems to me that would be the first thing because that is where you get your claims form [sic] amounts paid in settlement and attorneys fees and so on and there are elements there that you have to prove, plus you have the indemnification plus the wrongful act, correct?
 
 
 58
 MR. QUINLAN: I believe that is correct, your Honor.
 
 
 59
 THE COURT: It wasn't really set up that way, and, of course, if the jury found for Lafarge on indemnification, that wipes those claims out, whether or not you prove the others, correct?
 
 
 60
 MR. QUINLAN: I am at something of a disadvantage, your Honor, because my colleagues working on this are not here, but I believe that may be correct.
 
 
 61
 Mr. Quinlan did serve as a lead trial counsel for Lone Star. However, he did not draft the proposed jury instructions and he was quick to tell the court that he was not prepared to address the technical points under discussion. Perhaps to assuage Mr. Quinlan's obvious hesitancy, the court added, "I am just trying to get some advanced idea because I am going to be taking a close look at the instructions tomorrow and over the weekend...." JA 1154.
 
 
 62
 Mr. Quinlan's two brief responses in the second exchange do not evince a willingness to forego an alternative opportunity to recover over $83 million in settlement costs and litigation expenses--damages Lone Star had sought in this complicated case from the filing of the third-party complaints through the submission of proposed jury instructions. Mr. Quinlan's hesitant, equivocal statements do not assist in justifying the district court's abandonment determination.[3] Cf. Lamborn, 873 F.2d at 529 (" 'To establish an implied waiver, there must be a clear, unequivocal and decisive act of a party showing such a purpose' ") (citation omitted); accord Holder v. Maaco Enters., 644 F.2d 310, 312 (4th Cir.1981). Accordingly, we conclude that the exchanges between the district court and counsel do not reveal an intent to abandon by Lone Star.
 
 
 63
 C. Other Considerations Relevant to the Abandonment Issue
 
 
 64
 The district court justified its abandonment determination in part by surmising that Lone Star abandoned recovery of settlement costs and litigation expenses under the non-indemnification claims because of concern about the statutes of limitations. In its Memorandum and Order denying the parties' post-trial motions, the court said:
 
 
 65
 During argument on Lafarge's motion for judgment as a matter of law, it became apparent why Lone Star's substantial claim for settlement amounts paid and litigation expenses was being presented solely under a theory of indemnification.... [A]ny direct claim for the recovery of settlement amounts paid and litigation expenses as consequential damages would have to overcome serious hurdles based on the applicable statutes of limitations.
 
 
 66
 JA 585.
 
 
 67
 The record does support the conclusion that Lone Star was concerned that its warranty claims might be restricted by a four-year statute of limitations. For instance, in objecting to the court's ruling after the close of the evidence that settlement costs and litigation expenses could only be recovered under the common-law indemnification claim, counsel for Lone Star said:
 
 
 68
 MR. QUITMEYER: ... As a matter of fact, the reason for indemnification being pled as a separate claim was to get around or was to deal with the statute of limitations problems, which the Court has otherwise resolved.
 
 
 69
 For example, if we had no indemnification, no affirmative indemnification claim, but simply a breach of ... warranty claim, we were concerned, and there was some authority, as the Court knows, for the proposition that our claim would be limited to the four-year statute of limitations.
 
 
 70
 JA 1250 (emphasis added).
 
 
 71
 In other words, Lone Star added the common-law indemnification claim as an alternative to the non-indemnification claims to bolster its chances of recovering the settlement costs and litigation expenses. The district court, however, surmised that Lone Star had pursued a more cunning strategy: At the close of its case when it was concerned about statutes of limitations problems, Lone Star embraced common-law indemnification as the theory for recovery of settlement costs and litigation expenses. Then, at the close of evidence when it became concerned about the strength of its proof on indemnification, Lone Star reversed course and insisted it had been pursuing these costs and expenses under the non-indemnification claims all along. Such a strategy would have made no sense.
 
 
 72
 Even if Lone Star's breach of warranty claims had been subject to the four-year statute of limitations, it still had the potential to recover tens of millions of dollars. Lafarge claimed that about sixty percent of the damages sought by Lone Star would be barred under the statute of limitations defense. Such a reduction would still have left about $33 million on the table. Why then would Lone Star abandon efforts to recover at least some of the many millions spent on the railroad litigation?
 
 
 73
 Further, concerns about statutes of limitations would not have justified an abandonment strategy by Lone Star on its fraud claim. Lafarge does not dispute that Maryland prescribes a three-year statute of limitations for fraud running from the time of discovery. Lafarge conceded that the discovery inquiry was properly left to the jury and did not seek judgment as a matter of law on this issue. But for the abandonment determination, the jury could potentially have awarded Lone Star consequential damages under the fraud claim in the full amount of the settlement costs and litigation expenses.
 
 D. Conclusion
 
 74
 For the reasons outlined above, we hold that the district court's abandonment determination amounted to an abuse of discretion. The district court should have permitted the jury to consider the settlement costs and litigation expenses as a part of damages under both the common-law indemnification claims and (subject to the statutes of limitations defenses) the non-indemnification claims.
 
 
 75
 Accordingly, we vacate the judgment and remand for a new trial in accordance with this opinion.[4]
 
 IV. Scope of the New Trial
 
 76
 The parties disagree whether a new trial should encompass both liability and damages or just damages. Because of Lone Star's statements and submissions and the district court's rulings, Lafarge says it concluded before it began its defense case that Lone Star was not seeking settlement costs and litigation expenses under the nonindemnification claims. Had it concluded the opposite, Lafarge says it would have presented its case quite differently. Lone Star maintains that Lafarge fully defended all claims and that a new trial should be ordered only to determine damages.
 
 
 77
 Although the district court denied Lone Star's motion for a new trial, it observed that "[c]ertainly, if a new trial were to be granted, it would necessarily have to include a re-trial of both liability and damages issues." JA 589. We agree.
 
 
 78
 Rule 59(a), Federal Rules of Civil Procedure, provides that "[a] new trial may be granted ... on all or part of the issues...." Both appellate and trial courts enjoy broad discretion in determining whether to grant a new trial on all or only some of the issues. Spell v. McDaniel, 824 F.2d 1380, 1400 (4th Cir.1987), cert. denied, 484 U.S. 1027 (1988); Young v. International Paper Co., 322 F.2d 820, 822 (4th Cir.1963); Kuehne & Nagel (AG & Co) v. Geosource, Inc., 874 F.2d 283, 293 (5th Cir.1989); 6A James W. Moore et al., Moore's Federal Practice p 59.06 (2d ed.1993). In making the determination, a court should consider "the totality of the circumstances." See Wright et al., supra, Sec. 2814.
 
 
 79
 For a partial new trial to be ordered, it must appear that the issue to be retried is distinct and separable from the other issues. Atlantic Coast Line R.R. Co. v. Bennett, 251 F.2d 934, 938 (4th Cir.1958); Mason v. Mathiasen Tanker Indus., Inc., 298 F.2d 28, 33 (4th Cir.), cert. denied, 371 U.S. 828 (1962); 58 Am.Jur.2d New Trial Sec. 67 (1989). The grant of a new trial on part of the issues is improper "unless it is clear that no injustice will result." Bennett, 251 F.2d at 938.
 
 
 80
 We have concluded that the district court was wrong in characterizing some of Lone Star's statements as confirming abandonment of certain damage claims. However, we cannot go so far as to conclude that these statements (made before and during Lafarge's case) and certain rulings did not have an effect on Lafarge's trial strategy.
 
 
 81
 Lafarge insists it believed that Lone Star was seeking $83 million on the common-law indemnification claim, but only $1.2 million on the non-indemnification claims. Lafarge argues that, based on that belief, "the incentive to [defend the non-indemnification] ... portion of the case paled by comparison with the need to defend the $83,000,000 claim for [common-law] indemnification." Resp. Br. at 32. Some of Lafarge's trial strategy does support these assertions. For example, the district court excluded, on hearsay grounds, evidence showing that Lafarge offered to assist Lone Star in finding the cause of cracking in the ties. According to Lafarge, this evidence was relevant to defending Lone Star's fraud claim, which Lafarge believed was limited to $1.2 million. Lafarge says that it did not present testimony of witnesses with first-hand knowledge of these assistance offers because of its much greater need to concentrate on defending the $83 million common-law indemnification claim. We accept that. We are also persuaded that Lafarge would have concentrated on a fuller development of its statutes of limitations defenses if it had believed it was facing $83 million in damages on each and every claim.
 
 
 82
 After looking at all the circumstances (including the district court's rulings and the way the case was tried), we conclude that the issues of liability and damages are intertwined to the point that they should not be severed. It would be unjust to remand this case for less than a full trial. Accordingly, the scope of the new trial will encompass both liability and damages.
 
 
 83
 V. Lone Star's Motion to Amend its Complaint and Third-Party Complaints
 
 
 84
 This litigation was stayed under Section 362 of the Bankruptcy Code after Lone Star filed a Chapter 11 petition on December 10, 1990. The stay was not lifted until June 13, 1991. On June 14, 1991, the day after the stay was lifted and a year and a half before trial, Lone Star served a motion to amend its complaint and third-party complaints by adding a claim under the Massachusetts unfair trade practices statute. Mass. Ann. Laws ch. 93A, Sec. 2 (Law. Co-op.1991) ("the Chapter 93A claim"). The scheduling order's pleading amendment deadline had expired on November 5, 1990, thirty-five days before Lone Star's bankruptcy filing. At the time Lone Star filed its motion to amend, discovery cutoff and trial dates had not been set.
 
 
 85
 Lone Star asserts that its motion to amend was based in substantial part on deposition testimony about kiln instability which was elicited from Lafarge witnesses after the pleading amendment deadline. According to Lone Star, this new testimony contradicted earlier testimony of other Lafarge witnesses. Lafarge opposed the motion, but did not claim that Lone Star had delayed intentionally or that it (Lafarge) would have been prejudiced by an amendment at that stage of the litigation.
 
 
 86
 The district court indicated that for Lone Star to amend, it had to satisfy two prerequisites: First, under Fed.R.Civ.P. 16(b), it had to "show[ ] ... good cause" for modifying the amendment deadline in the scheduling order; and, second, it then had to show the amendment was proper under Fed.R.Civ.P. 15(a). The court denied leave to amend because it did not find "good cause" under the first prong of the test, and it therefore did not consider the second.
 
 
 87
 The district court had three reasons for not finding "good cause": (1) it said the Chapter 93A claim was essentially duplicative of claims already asserted by Lone Star, (2) it said that much of the evidence to support the new claim was available prior to the amendment deadline, and (3) it was concerned about delay.
 
 
 88
 A district court's decision to deny amendment of pleadings will not be disturbed absent an abuse of discretion. Foman v. Davis, 371 U.S. 178, 182 (1962). This discretion, however,
 
 
 89
 is limited by the principle, embodied in Rule 15(a) that "leave shall be freely given when justice so requires," and by the general policy embodied in the Federal Rules favoring resolution of cases on their merits.
 
 
 90
 Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir.), cert. dismissed, 448 U.S. 911 (1980).
 
 
 91
 In exercising its discretion, a district court should center its attention " 'on prejudice or futility or bad faith as the only legitimate concerns in denying leave to amend, since only these [factors] truly relate to protection of the judicial system or other litigants.' " Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 279 (4th Cir.1987) (quoting Piper Aircraft, 615 F.2d at 613). Delay alone is insufficient to deny leave to amend. Island Creek, 832 F.2d at 279. Rather, " '[t]he delay [must be] accompanied by prejudice, bad faith, or futility.' " Id. at 279 (quoting Johnson v. Oroweat Foods Co., 785 F.2d 503, 509-10 (4th Cir.1986)). Indeed, the "absence of prejudice, though not alone determinative, will normally warrant granting leave to amend." Piper Aircraft, 615 F.2d at 613 (citation omitted).
 
 
 92
 Neither party has questioned whether the district court was correct to link Rule 16(b) and Rule 15(a). We need not consider that issue here because we conclude that Lone Star satisfied both rules.[5] As for Rule 16(b), first, it is implicit in the district court's ruling that some of the evidence needed by Lone Star to prove its new Chapter 93A claim did not surface until after the amendment deadline. This alone justifies a finding of good cause under Rule 16(b). Forstmann v. Culp, 114 F.R.D. 83, 86 n. 1 (M.D.N.C.1987) (" 'Good cause' for modifying the scheduling order might exist if ... plaintiff uncovered previously unknown facts during discovery that would support an additional cause of action"); cf. Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1044 (4th Cir.1984) (finding abuse of discretion in refusal to permit amendment of complaint where evidence for amendment was discovered shortly before trial). Second, if the time of the bankruptcy stay is excluded, Lone Star served its motion to amend only thirty-six days after the deadline. We appreciate the district court's concern about the potential for delay. But, at the time the district court denied the motion to amend, no cutoff date for discovery had been established and no trial date had been set. Indeed, discovery continued for about a year after Lone Star's motion to amend. There is no suggestion that Lone Star was being dilatory. Given the bankruptcy, it appeared to be doing the best it could. Accordingly, we conclude that Lone Star, under Rule 16(b), demonstrated good cause for deviation from the pleadings amendment deadline in the scheduling order.
 
 
 93
 As for Rule 15(a), there is no showing by Lafarge that it would have been prejudiced by the proposed amendment. This militates strongly in favor of granting leave to amend. As the district court recognized, the factual issues raised by the new claim were encompassed in claims asserted from the outset. In any event, there was plenty of time left for Lafarge to analyze the new Chapter 93A claim and to do any additional discovery. Finally, there is no suggestion that Lone Star acted in bad faith or that the amendment would be futile.
 
 
 94
 We conclude that "this is one of those rare cases in which a refusal by the district judge to grant an amendment represents an abuse of discretion." Island Creek, 832 F.2d at 281. We reverse the district court's orders on this issue and, on remand, grant Lone Star leave to amend to add its Chapter 93A claim.
 
 
 95
 VI. Lone Star's Damage Claims for Lost Future Profits and Asset Write-offs
 
 
 96
 Lone Star contends the district court also erred in granting Lafarge's motion for judgment as a matter of law on Lone Star's damage claims for over $3 million in lost future profits and asset write-offs. Lafarge counters that it was not the proximate cause of these alleged damages, and, further, that the evidence concerning lost future profits was uncertain, contingent, and speculative.
 
 
 97
 We review the district court's determination de novo, Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 318 (4th Cir.), cert. denied, 113 S.Ct. 206 (1992), and examine whether, "viewing the evidence in the light most favorable to the non-moving party and giving [it] the benefit of all reasonable inferences, there is sufficient evidence in the record to support a jury verdict in [its] favor." Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988), cert. denied, 490 U.S. 1107 (1989).
 
 
 98
 At trial, Lone Star claimed that the cracking of the ties led to adverse publicity and forced its withdrawal from the tie manufacturing business. As a result, Lone Star said it had to shelve assets and forego prospective profits it otherwise would have enjoyed.
 
 
 99
 First, Lafarge argues that Lone Star failed to show, as a matter of law, that its allegedly defective cement was the proximate cause of the asset write-offs and any lost future profits. We disagree.
 
 
 100
 Prior to the widespread cracking of the hundreds of thousands of ties sold to the railroads, Lone Star appears to have enjoyed steady success in the industry. While profits were not "great," according to Lone Star's board chairman, David Wallace, Lone Star's expectations of substantial future business from existing customers appear to have been justified. For instance, Victor Burton oversaw Lone Star's tie manufacturing for eight years and supervised its marketing. Approximately two months before the first reports of cracking, Burton projected that Lone Star would manufacture in excess of 1,560,000 ties for Amtrak and the Massachusetts Bay Transportation Authority (MBTA) alone ("the Burton forecast"). The Burton forecast was based on his conversations with management and engineering personnel from both Amtrak and MBTA. The following facts provided a further basis for the Burton forecast: (1) both MBTA and Amtrak had purchased ties from Lone Star before, (2) MBTA had performed engineering studies and specified the number of ties it would require, (3) the MBTA track bed adjoined the Lone Star facility, and (4) Amtrak was pleased with Lone Star's quality control. Further, Lone Star's accounting expert, Frederic Miller, testified that between 1984 and 1989, Lone Star's share of the East Coast market was fifty-three percent. However, following the railroads' first complaint to Lone Star in August 1988 that ties were cracking, Lone Star never again received a single order for ties.
 
 
 101
 Lafarge's most substantial argument on the causation issue concerns "indications" that Lone Star had considered selling its tie business even before it received the first word of tie cracking. This may be so. But that was for the jury to weigh and did not entitle Lafarge to judgment as a matter of law.
 
 
 102
 Viewing the foregoing evidence in the light most favorable to Lone Star and giving it the benefit of all reasonable inferences, we conclude that it was sufficient to withstand a motion for judgment as a matter of law on the proximate cause issue.
 
 
 103
 Second, Lafarge argues that Lone Star's evidence of lost future profits was speculative and conjectural. The district court and the parties were all correct that Massachusetts law applies to this issue. We begin with the proposition that Massachusetts permits "an element of uncertainty" in proving damages for lost profits. Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc., 440 N.E.2d 29, 48 (Mass.App.Ct.), review denied, 441 N.E.2d 260 (Mass.1982). Further, a plaintiff need not prove its lost profits with mathematical precision. See Delano Growers' Coop. Winery v. Supreme Wine Co., Inc., 473 N.E.2d 1066, 1077 (Mass.1984); Smith Pontiac, 440 N.E.2d at 48 ("an award of [lost profits] can stand on less than substantial evidence. This is particularly the case in business torts, where the critical focus is on the wrongfulness of the defendant's conduct") (citations omitted).
 
 
 104
 Testimony by both experts and company management is suitable for proving lost profits. Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 220 (1st Cir.1991) ("we cannot say that [a company representative's] uncontroverted fiscal 1985 projection, weak as it was, was insufficient to support a $45,000 award of consequential damages for loss of prospective profits...."); Knightsbridge Mktg. Servs. Inc. v. Promociones Y Proyectos, S.A., 728 F.2d 572, 576 (1st Cir.1984) ("Expert testimony alone has been explicitly recognized as a method of proving prospective damages" in Massachusetts) (citation omitted); see City Welding & Mfg. Co. v. Gidley-Eschenheimer Corp., 451 N.E.2d 734, 736 (Mass.App.Ct.1983) (testimony of company president proper on question of lost profits even though he failed to "give the basis of his calculations" because "this omission merely [went] to the weight of his opinion and not to its admissibility").
 
 
 105
 Nevertheless, "profits cannot be recovered ... when they are remote, or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof." White Spot Constr. Corp. v. Jet Spray Cooler, Inc., 183 N.E.2d 719, 722 (Mass.1962) (citing John Hetherington & Sons, Ltd v. William Firth, Co., 95 N.E. 961, 964 (Mass.1911)). Commentators say that Massachusetts "has not ... consistently applied any articulated standard for recovery of lost profits." Michael D. Weisman & Ben T. Clements, Protecting Reasonable Expectations: Proof of Lost Profits for New Businesses, 76 Mass. L.Rev. 186, 189 (1991). We agree that the Supreme Judicial Court of Massachusetts does not always use precisely the same language. But the inquiry does center on "whether [plaintiff] has shown by reasonable proof that at least he certainly has lost some profits by the breach and that a fairly accurate estimate may be made of this portion." Gagnon v. Sperry & Hutchinson Co., 92 N.E. 761, 763-64 (Mass.1910); see Knightsbridge, 728 F.2d at 575.
 
 
 106
 The Burton forecast was enough to raise a jury question on whether some profits were lost by Lone Star. Miller, the accounting expert, estimated the amount of these lost profits. Miller's analysis was based on a lost profit opportunity with Amtrak for work on the Northeast Corridor Improvement Program II. Miller referred to this as an "absolutely known opportunity," because Congress had approved the program and the contract was to be put out to bid. Miller testified that Lone Star would have an "upper hand" in bidding on the contract because its manufacturing plant was located in Littleton, Massachusetts, and "the distinct competitive advantage in this industry [is] location." JA 1008. This contract would involve the purchase of 422,400 ties. Miller calculated Lone Star's average gross profit per tie at $9.62, which multiplied by the ties in the Amtrak contract yielded over $4 million. Miller, however, reduced the $4 million figure to approximately $2.1 million to coincide with Lone Star's eastern market share of fifty-three percent. Miller further discounted this figure by an interest rate of fifteen percent, because Lone Star would not be able to earn the entire profit in a single year. The final amount for the single lost profit opportunity on the Amtrak contract was $1,239,387. Miller increased this figure to $1.8 million based upon market analyses which indicated that Lone Star would have had tie orders in addition to the single Amtrak contract.
 
 
 107
 This expert testimony, together with the Burton forecast and other testimony and exhibits, was sufficient to withstand judgment as a matter of law. We disagree with the district court that this evidence was "much too speculative and conjectural" because it presupposed "[t]oo many diverse and unknown factors." JA 593, 1080. As stated in Smith Pontiac, some element of uncertainty is inherent in any estimate of prospective damages. See also United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992-93 (4th Cir.), cert. denied, 454 U.S. 1054 (1981) ("the calculation of [future profits] was necessarily dependent upon calculations and estimates of experts in the field" and a "reasoned estimate" by such an expert provided the jury a basis upon which to award $571,000 in damages).[6]
 
 
 108
 We therefore conclude that the district court erred in granting Lafarge judgment as a matter of law on Lone Star's damage claims for lost future profits and asset write-offs.
 
 VII. Conclusion
 
 109
 For the foregoing reasons, the judgment of the district court is vacated and remanded for a new trial on all issues relating to both liability and damages. Further, the district court's August 8, 1991 and October 1, 1992 orders denying Lone Star leave to amend its complaint and third-party complaints are reversed.
 
 VACATED, REVERSED, AND REMANDED
 
 
 [1]
 Lafarge provided written certification with each shipment to Lone Star that the cement met American Society for Testing and Materials (ASTM) Specification C150. That specification, among other things, establishes maximum permissible levels of sulphate in cement
 
 
 [2]
 Lafarge says that "[t]he fundamental issue in this case is not whether Lone Star has 'abandoned' an issue in the pleadings--a word which [the district court] never used and to which [it] properly attributed no significance--but instead whether Lone Star should be permitted to disavow ... a theory of indemnification to which it has hewed from the very outset...." Resp. Br. at 4-5. Regardless of the words used, a reading of the record clearly establishes that the district court in effect ruled that Lone Star had abandoned or waived settlement costs and litigation expenses as to the non-indemnification claims--claims it had asserted since the beginning of this litigation
 
 
 [3]
 Lafarge cites additional statements in the record in an attempt to shore up the district court's abandonment determination. They are of little value to our inquiry. For instance, Lafarge relies on the following exchange that occurred immediately after Mr. Quinlan said he was "at ... a disadvantage" in trying to respond to the court:
 THE COURT: ... when we get to limitations, I have already ruled on the limitations in terms of the indemnification, and that covers the greater amount of the claim, so we only have limitations left for the direct claim for lost profits. Would that be correct?
 * * *
 MR. QUINLAN: Even as to that, your Honor, I believe that is only partial, part of the period.
 JA 1154-55.
 These statements and others cited by Lafarge are even more tenuous than those we have discounted above.
 We also discount an ambiguous statement by Lafarge's counsel that was relied on by the district court. Ambiguity aside, statements by Lafarge's counsel cannot be used to impute abandonment intent to Lone Star.
 
 
 [4]
 Lone Star argues separately that even if it somehow abandoned pursuit of the settlement costs under the non-indemnification claims, it clearly sought consequential damages for the litigation expenses under these claims. Given our conclusion that Lone Star sought the same damages under each of its claims, we need not reach this issue
 Lone Star states (Reply Br. at 17-18) that "if this Court holds that the trial court erred as to the alleged waiver of these consequential damages claims ... it would be unnecessary to reach" the issue whether the district court erred in instructing the jury that any negligence by Lone Star precluded indemnification even if Lafarge committed fraud. Accordingly, we do not take up this issue.
 Finally, because we remand this action for a new trial on all issues, see infra, we do not separately address Lafarge's cross appeal which sought, in the alternative, a new trial on the ground that Lone Star's evidence was legally insufficient to establish causation and fraud.
 
 
 [5]
 Recent cases illustrate differing conclusions on the interaction between Rules 15(a) and 16(b). See, e.g., Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-08 (9th Cir.1992) (once scheduling order is filed pursuant to Rule 16(b), the good cause standard controls over the Rule 15(a) standard); Riofrio Anda v. Ralston Purina, Co., 959 F.2d 1149, 1154-55 (1st Cir.1992) (applied a Rule 15(a) analysis without mentioning the good cause requirement of Rule 16(b)); Reynolds v. Borough of Avalon, 799 F.Supp. 442, 450 (D.N.J.1992) (reading Rule 15(a) "in conjunction with" Rule 16(b))
 
 
 [6]
 We have also considered, and find no merit in, Lafarge's other arguments on the lost future profits/asset write-offs issue