

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-2003

# Morton Intl Inc v. AE Staley Mfg Co

Precedential or Non-Precedential: Precedential

Docket No. 01-4259

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

## Recommended Citation

"Morton Intl Inc v. AE Staley Mfg Co" (2003). *2003 Decisions.* Paper 233.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/233

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 16, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 01-4259

———————

MORTON INTERNATIONAL, INC.; VELSICOL CHEMICAL
CORPORATION; NWI LAND MANAGEMENT CO.; FRUIT
OF THE LOOM, INCORPORATED,

v.

A.E. STALEY MANUFACTURING COMPANY; AIRCO
INDUSTRIAL GASES, a/k/a AIR REDUCTION COMPANY,
INC., f/k/a AIRCO, INC.; ALLIED CHEMICAL
CORPORATION; ALUMINUM COMPANY OF AMERICA
(ALCOA); AMERICAN CYANAMID COMPANY; ARMSTRONG
WORLD INDUSTRIES, INC.; ARSYNCO, INC.; BAILEY
CONTROLS CO., f/k/a BAILEY METER COMPANY;
BECTON-DICKINSON & CO., INC.; BELFORT
INSTRUMENT CO.; BELMONT METALS, INC., f/k/a
BELMONT SMELTING & REFINING WORKS, INC.;
CANADIAN GYPSUM COMPANY, LTD.; CANRAD, INC.,
(c/o Canrad Precision Industries, Inc.); CIBA-GEIGY
CORPORATION; COLUMBIA UNIVERSITY; CONOPCO,
INC., (Cheeseborough Ponds U.S.A. Co. Division); COSAN
CHEMICAL CORP.; CROUSE HINDS SEPCO
CORPORATION, f/k/a CONNECTICUT INTERNATIONAL;
CROWN ZELLERBACH CORP., a/k/a JAMES RIVER
CORPORATION OF NEVADA; CURTISS-WRIGHT; D.F.
GOLDSMITH CHEMICAL & METAL CORPORATION; DAY
& BALDWIN, f/k/a C-P PHARMACEUTICALS, INC.;
DIAMOND SHAMROCK CHEMICALS COMPANY, a/k/a
OCCIDENTAL ELECTROCHEMICALS CORPORATION;
DOW-CORNING CORPORATION; DURA ELECTRIC LAMP
CO., INC.; DURACELL, INC., (as successor to Mallory
Battery Co., Inc.); E.I. DUPONT DE NEMOURS & CO.;

EASTERN SMELTING & REFINING CORP.; EAGLEHARD MINERALS AND CHEMICALS CORPORATION; ENVIRONMENTAL CONTROL SYSTEMS; EXXON CORPORATION; FEDERAL AVIATION ADMINISTRATION; GARFIELD BARING CORPORATION, f/k/a GARFIELD SMELTING & REFINING CO.; GENERAL ELECTRIC COMPANY; GENERAL COLOR CO., INC.; GENERAL SIGNAL CORPORATION; GILMARTIN INSTRUMENT CO.; HARTFORD ELECTRIC SUPPLY COMPANY, INC.; HENKEL CORPORATION; HOFFMAN-LAROUCHE, INC.; HUDSAR, INCORPORATED; INMAR ASSOCIATES, INC.; INMAR REALTY, INC.; INTERNATIONAL NICKEL, INC.; J.M. NEY COMPANY; K.E.M. CHEMICAL COMPANY; KOPPERS, a/k/a BEAZER EAST, INC.; MAGNESIUM ELEKTRON, INC.; MARVIN H. MAHAN; MALLINCKRODT CHEMICAL, INC.; MARISOL, INC.; MERCK & CO., INC.; MERCURY ENTERPRISE, INC., f/k/a MERCURY INSTRUMENT SERVICE; MINNESOTA MINING AND MANUFACTURING COMPANY; MOBIL OIL CORPORATION; MT. UNION COLLEGE; M.W. KELLOGG CO.; NATIONAL LEAD COMPANY, (Goldsmith Brothers Division); NEPERA, INC.; NEW ENGLAND LAMINATES CO., INC.; NEW JERSEY INSTITUTE OF TECHNOLOGY, f/k/a NEWARK COLLEGE OF ENGINEERING; NEW YORK CITY TRANSIT AUTHORITY; NORTHEAST CHEMICAL CO., (Northeast Chemical & Industrial Supply Co., Inc.); OCCIDENTAL CHEMICAL CORPORATION, (as successor to Diamond Shamrock Chemical Co., formerly Diamond Shamrock Corporation); OLIN CORPORATION, f/k/a OLIN MATHIESON CHEMICAL CORPORATION; PEASE & CURREN, INC.; PFIZER, INC.; PSG INDUSTRIES, INC., f/k/a PHILADELPHIA SCIENTIFIC GLASS, INC.; PHILLIPS & JACOBS, INC.; PUBLIC SERVICE ELECTRIC & GAS, (PSE&G); PURE LAB OF AMERICA; RANDOLPH PRODUCTS COMPANY; RAY-O-VAC DIVISION OF ESB, INC., (ESB, INC.); REDLAND MINERALS LIMITED; RHONE-POULENC, INC., f/k/a ALCOLAC CHEMICAL COMPANY/GUARD CHEMICAL COMPANY; ROYCE ASSOCIATES, f/k/a ROYCE CHEMICAL; RUTGERS, THE STATE UNIVERSITY; SCIENTIFIC CHEMICAL PROCESSING, INC.; SCIENTIFIC CHEMICAL TREATMENT CO., INC.; SCIENTIFIC, INC.; SEAFORTH MINERAL & ORE CO.; SPARROW REALTY, INC.; STATE UNIVERSITY

OF NEW YORK AT BUFFALO, (S.U.N.Y.A.B.); SYLVANIA/GTE; TENNECO, INC.; TRANSTECH INDUSTRIES, INC.; UEHLING INSTRUMENT CO., INC.; UNION CARBIDE CORPORATION; UNIVERSAL OIL PRODUCTS CO.; UNIVERSITY OF ILLINOIS; UNIVERSITY OF MINNESOTA; VAR-LAC-OID CHEMICAL COMPANY, INC.; W.A. BAUM CO., INC.; WAGNER ELECTRIC COMPANY; WESTERN MICHIGAN UNIVERSITY; WESTINGHOUSE ELECTRIC CORPORATION; JOHN DOE 1-100; GEROLD C. THOMPSON, ESQ.; GEORGE VAN CLEVE, ESQ.; THE CONNECTICUT LIGHT AND POWER COMPANY, f/k/a HARTFORD ELECTRIC LIGHT COMPANY; GTE OPERATIONS SUPPORT INCORPORATED; ALLIEDSIGNAL, INC.; BEAZER EAST, INC.; JERSEY CITY MANAGEMENT, INC.; MICHAEL RODBURG, Site Defendants Liasion Counsel; ASHLAND CHEMICAL CO., a Division of Ashland Oil, Inc.; BASF CORPORATION, and as successor to Wyandotte Chemical Corp., a/k/a INMONT CORPORATION; FMC CORPORATION

Morton International, Inc.,

Appellant

———————————

On Appeal from the United States District Court
for the District of New Jersey

District Court Judge: Honorable Katherine S. Hayden
(D.C. No. 96-cv-03609)

———————————

Argued on July 7, 2003

Before: FUENTES, SMITH, and GREENBERG,
*Circuit Judges.*

(Opinion Filed: September 16, 2003)

———————————

Samuel P. Moulthrop
Riker, Danzig, Scherer, Hyland
 & Peretti
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962

Joseph S. Justice
Thomas T. Terp
Taft, Stettinius & Hollister
425 Walnut Street
1800 Firstar Tower
Cincinnati, OH 45202

John G. Harkins, Jr. [ARGUED]
Steven A. Reed
Harkins Cunningham
2005 Market Street
2800 One Commerce Square
Philadelphia, PA 19103

Laurence S. Kirsch
Jonathan R. Stone
Frederick R. Anderson
Cadwalader, Wickersham & Taft
1210 F. Street, N.W.
Suite 1100
Washington, D.C. 20004

*Attorneys for Appellant*

David J. D'Aloia [ARGUED]
Robert B. Nussbaum
Michelle V. Fleishman
Saiber, Schlesinger, Satz &
 Goldstein
One Gateway Center
Suite 1300
Newark, NJ 07102

*Attorneys for Appellee
Tenneco, Inc.*

---

**OPINION OF THE COURT**

---

FUENTES, *Circuit Judge*:

This appeal challenges the grant of summary judgment to one defendant, Tennessee Gas Pipeline Co. ("Tenneco"), in an action seeking contribution toward environmental cleanup costs. These costs have been or will be incurred by plaintiff-appellant Morton International, Inc. ("Morton") in regard to the Ventron/Velsicol Superfund Site in Wood Ridge, New Jersey (the "Site" or "plant"). Morton and three other plaintiffs, who are not parties to this appeal, sought contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 *et seq.*, and common law.

Morton argues that Tenneco should be responsible, under the "arranged for" provision of CERCLA Section 107(a)(3), for some of the cleanup costs because it arranged for the processing of mercury at the facility for many years, resulting in the release of hazardous waste into the environment. Because we agree with Morton that material factual issues remain with respect to whether Tenneco (1) owned or possessed prime virgin mercury, (2) had knowledge of the environmental hazards of mercury processing at the plant, (3) had control over the hazardous waste disposal practices at the plant, and (4) shipped its own "dirty mercury" to the plant, we will remand for further proceedings consistent with this opinion.

## I.  Background

### A.  Factual

The parties dispute many of the facts central to this appeal, but the following facts are undisputed. From 1929 to 1974, a mercury processing plant was operated at the Site. The plant was the largest domestic producer of intermediate inorganic mercury compounds, including red

and yellow oxides of mercury ("ROM" and "YOM"). The compounds were formulated, at least in part, using prime virgin mercury ("PVM"). In addition, the plant cleaned mercury that had been contaminated ("dirty mercury") and then converted it into intermediate compounds for some of its customers. The plant released harmful waste into the environment for decades.

The plant was owned by F.W. Berk & Company from 1929 to 1960. It was transferred to Wood Ridge Chemical Corporation (its parent company is Velsicol Chemical Corporation) in 1960, and then again to Ventron Corporation in 1968. The plant was closed in 1974. Sometime thereafter, Ventron merged into Thiokol, which then merged into Morton-Thiokol, which eventually became Morton.

The parties agree that Tenneco purchased ROM and YOM from the plant from 1963 until the early 1970's. The parties disagree, however, as to the nature of the transactions between Tenneco and the plant, Tenneco's knowledge of waste disposal by the plant, and whether Tenneco shipped "dirty mercury" to the plant for processing.

## B. Prior Litigation

In the 1970's, the New Jersey Department of Environmental Protection commenced an action against Ventron, Velsicol, and other parties for cleanup and removal of mercury at the Site. Eventually, Velsicol and Morton were held strictly liable, jointly and severally, for the cleanup of the Site, and that judgment was upheld following numerous appeals and successive litigation. *See Morton International, Inc. v. General Acc. Ins. Co. of America*, 629 A.2d 831, 880 (N.J. 1993) (concluding that Morton's predecessors had intentionally discharged pollutants over a long period of time); *State Department of Environmental Protection v. Ventron Corp.*, 468 A.2d 150, 161-62 (N.J. 1983) (finding defendants violated statute prohibiting the discharge of detrimental material into waters by intentionally permitting mercury-laden effluent to escape onto lands surrounding creek). After the enactment of CERCLA in 1980, and the listing of the Site on the National

Priorities List, Morton, as the current owner of the Site, Velsicol, and various other entities were required to perform a remedial investigation/feasibility study for the Site. Since then, Morton has been funding the environmental efforts under various judicial orders.

## C.  The present litigation

Morton filed this action in 1996 seeking contribution from Tenneco and numerous other defendants under CERCLA, 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), Pub. L. No. 94-580, § 1, 90 Stat. 2795 (1976), as amended 42 U.S.C. § 6901 *et seq.*, the Spill Act, N.J.S.A. 58:10-23.11 *et seq.*, and common law.[1] Morton argues that the "conversion" or "toll" agreements, whereby the plant processed the customers' PVM into ROM and YOM, and the "dirty mercury" processing agreements render the customer-defendants subject to CERCLA liability as "arrangers" under Section 107(a)(3), 42 U.S.C. § 9607(a)(3). Morton is trying to recover from other allegedly responsible parties some of the costs it has incurred and will continue to incur to clean up the Site.

Tenneco and the other defendants refuse to share responsibility for the cleanup costs. The defendants argue that Morton's characterization of the PVM transactions is inaccurate; these transactions were nothing more than straight purchases of finished products (ROM and YOM), which do not expose them to CERCLA liability. On April 11, 2000, Tenneco and the other defendants moved for summary judgment in an omnibus motion. The District Court denied their motion with respect to the CERCLA, Spill Act, and common law claims because of the varying, complex fact patterns and material factual disputes with

---

1. Velsicol and its related entities were plaintiffs below, but have withdrawn their appeal of the District Court's order. Because they are no longer parties to this appeal, we refer only to Morton's pursuit of these causes of action against the defendants.

respect to each defendant. The District Court granted the defendants' motion to dismiss Morton's RCRA claim.[2]

Several months later, Tenneco filed a renewed motion for summary judgment — this time on its own behalf. Morton responded by incorporating by reference the briefings and evidence it had submitted in response to the omnibus summary judgment motion. After hearing oral argument on Tenneco's individual motion, the District Court ruled from the bench and granted summary judgment to Tenneco on all claims.

## II.  Jurisdiction

The District Court had jurisdiction over Morton's federal claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613. The District Court exercised pendent jurisdiction over Morton's state law claim pursuant to 28 U.S.C. § 1367. We have jurisdiction to hear this appeal from the final order of the District Court pursuant to 28 U.S.C. § 1291.[3]

## III.  Analysis

The District Court has asked us to "definitively address" the standard for "arranger liability" under CERCLA Section 107(a)(3) in this Circuit in order to properly resolve

2. The District Court's grant of judgment to the defendants on Morton's RCRA claim is not before us on appeal.

3. The District Court granted the parties' joint motion to certify the dismissal of Tenneco from this action as a final, appealable order pursuant to Federal Rule of Civil Procedure 54(b). Although the District Court's July 17, 2001 order disposed of Morton's claims only against Tenneco, leaving in place the claims against the other defendants, the Court entered a final judgment with respect to Tenneco because: (a) Morton's claims against Tenneco are separable from the remaining claims; (b) this Court will not be required to decide the same issues even if there are subsequent appeals by other defendants; (c) the standard for "arranger liability" under CERCLA has not been "definitively addressed" by this Court; (d) the prospects for final resolution of Morton's claims will be improved by a ruling on the standard; and (e) certification of the judgment in favor of Tenneco will not prejudice the remaining defendants. (App. at 4-5).

Morton's contribution claims against Tenneco and the other defendants in this case.[4]

### A.   CERCLA "Arranger Liability" Standard

Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (citation omitted).

> As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites. Sections 104 and 106 provide the framework for federal abatement and enforcement actions that the President, the EPA as his delegated agent, or the Attorney General initiates. 42 U.S.C. § 9604, 9606. These actions typically require private parties to incur substantial costs in removing hazardous wastes and responding to hazardous conditions. Section 107 sets forth the scope of the liabilities that may be imposed on private parties and the defenses that they may assert. 42 U.S.C. § 9607.

*Key Tronic Corp. v. United States,* 511 U.S. 809, 814 (1994). In 1986, Congress amended CERCLA with the Superfund Amendments and Reauthorization Act ("SARA") and included a provision — Section 113 — that expressly created a cause of action for contribution. *See* 42 U.S.C.

---

4. We once came close to stating a standard for "arranger liability" under CERCLA. In *FMC Corporation v. United States Dep't of Commerce*, No. 92-1945, 1993 WL 489133, at *11 (3d Cir. 1993), this Court adopted the test for "arranger liability" articulated by the Eighth Circuit in *United States v. Aceto Agricultural Chems. Corp.*, 872 F.2d 1373, 1379-82 (8th Cir. 1989). That decision was vacated, however, after the Court granted rehearing en banc. *See FMC Corp.*, 10 F.3d 1003 (3d Cir. 1994). In the superseding en banc decision, the Court affirmed the district court's judgment holding the government liable as an arranger without discussion because the Court was "equally divided on this point." *FMC. Corp.*, 29 F.3d 833, 846 (3d Cir. 1994). Accordingly, this Court has neither ruled on the validity of the *Aceto* test for "arranger liability," nor articulated its own test up to this point. *See United States v. Occidental Chem. Corp.*, 200 F.3d 143, 145 (3d Cir. 1999).

§ 9613(f). "A principal goal of Section 113 was to 'clarif[y] and confirm[] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.'" *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1122 (3d Cir. 1997) (quoting H.R.Rep. No. 99-253(I), at 79 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2861; H.R. Conf. Rep. No. 99-962, at 221 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3314).

Accordingly, CERCLA and SARA together create two legal actions by which parties that have incurred costs associated with cleanups can recover some or all of those costs: (1) Section 107 cost recovery actions; and (2) Section 113 contribution actions. Section 113, the cause of action Morton is pursuing against Tenneco, provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [Section 107], during or following any civil action under [Section 107]. . . ." 42 U.S.C. § 9613(f)(1).

Section 107 defines those who are "potentially responsible persons" ("PRP's") as: (1) the current owner or operator of a facility; (2) any person who owned or operated the facility at the time of the disposal of any hazardous substances; (3) "any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person, by any other party . . . at any facility;" and (4) any person who accepts or accepted hazardous substances for transport to sites selected by such person, "from which there is a release, or a threatened release which causes the incurrence of response costs . . . ." 42 U.S.C. § 9607(a).

Congress did not define the term "arranged for" in the statute. Thus, our interpretation of the term begins with the plain meaning. To repeat, Section 107(a)(3) holds responsible those who "by contract, agreement, or otherwise arranged for" the disposal or treatment of hazardous substances. The verb "arrange" is defined (as relevant to its usage in this section) as "to make preparations for." *See* Webster's Third New International

Dictionary 120 (1993). The dictionary definition of "arrange" does not shed much light on the proper scope of liability under this section. However, by including "or otherwise" after "by contract [or] agreement," Congress expanded the means by which a party could possibly "arrange for" the treatment or disposal of hazardous substances in defining this category of PRP. We think that this expansive list of means indicates that Congress intended this category of PRP to be broadly construed.

Our view that "arranged for" is to be broadly construed is consistent with Congress's overall purpose in enacting CERCLA. Two of the main purposes of CERCLA are "prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party." *General Electric Co. v. Litton Ind. Auto. Sys., Inc.*, 920 F.2d 1415, 1422 (8th Cir. 1990), *cert. denied*, 499 U.S. 937 (1991), *abrogated on other grounds*, *Key Tronic*, 511 U.S. at 814, 819. In enacting CERCLA, Congress intended that "those actually 'responsible for any damage, environmental harm, or injury from chemical poisons [may be tagged with] the cost of their actions.'" *Bestfoods*, 524 U.S. at 55-56 (quotations and citations omitted). "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 21 (1989) (plurality op. of Brennan, J.) (emphasis in original), *overruled on other grounds*, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996); *see also Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1221 (3d Cir. 1993). Accordingly, we interpret the term "arranger liability" broadly in keeping with the plain meaning of Section 107(a)(3) and the remedial statutory scheme of CERCLA.

Almost all of our sister circuit courts have adopted a standard for "arranger liability," but the standards adopted vary. *See Geraghty and Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 929 (5th Cir. 2001), *cert. denied*, 533 U.S. 950 (2001); *Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 164 (2d Cir. 1999); *Pneumo Abex Corp. v. High Point, Thomasville and Denton R.R. Co.*, 142 F.3d 769, 775 (4th Cir. 1998); *United States v. Cello-Foil Products, Inc.*, 100 F.3d 1227, 1231-32

(6th Cir. 1996); *South Florida Water Management District v. Montalvo*, 84 F.3d 402, 407 (11th Cir. 1996); *Amcast Industrial Corporation v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir. 1993); *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 695 (9th Cir. 1992); *United States v. Aceto Agricultural Chems. Corp.*, 872 F.2d 1373, 1381-82 (8th Cir. 1989).

Our review of these decisions leads us to conclude that the courts are virtually unanimous with respect to two points. First, the determination of "arranger liability" is a fact-sensitive inquiry that requires a multi-factor analysis. Second, courts must look beyond the defendant's characterization of the transaction at issue in order to determine whether the transaction, in fact, involves an arrangement for the disposal or treatment of a hazardous substance. We absolutely agree with both of these points.

However, there is not as much agreement among our sister circuits as to which factors must be considered — or what priority they should receive — in conducting the multi-factor "arranger liability" analysis. In fact, some courts require a showing of intent to dispose of or treat hazardous substances, *see Cello-Foil*, 100 F.3d at 1232 ("in the absence of a contract or agreement, a court must look to the totality of the circumstances, including any 'affirmative acts to dispose,' to determine whether the Defendants intended to enter into an arrangement for disposal. . . . [A] party can be responsible for 'arranging for' disposal, even when it has no control over the process leading to the release of substances."); *Amcast*, 2 F.3d at 751 ("arranged for" . . . "impl[ies] intentional action."); while others require only a demonstration of control and/or ownership over the hazardous substances that are being disposed of or treated. *See, e.g., Aceto*, 872 F.2d at 1380 (rejecting reading of Section 107(a)(3) that requires proof that defendant intended to dispose of a waste, and focusing on defendant's ownership of raw materials and control over formulation process).

There has been some disagreement, too, as to whether ownership or control over the material being processed is the more critical factor in the "arranger liability" analysis. *C.f. United States v. Hercules*, 247 F.3d 706, 720 (8th Cir.

2001) (implying that ownership without control would suffice and stating that "[c]ontrol . . . is not a necessary factor") and *Jones-Hamilton*, 973 F.2d at 695 (liability based on ownership without control); *with United States v. Shell Oil Co.*, 294 F.3d 1045, 1055-56 (9th Cir. 2002) (proof of ownership not required because actual control is the "crucial element").

After carefully examining the language of the statute and considering the standards adopted by other courts, we conclude that the most important factors in determining "arranger liability" are: (1) ownership or possession; and (2) knowledge; or (3) control. Ownership or possession of the hazardous substance must be demonstrated, but this factor alone will not suffice to establish liability. A plaintiff must also demonstrate either control over the process that results in a release of hazardous waste *or* knowledge that such a release will occur during the process.[5] We note, too, that in conducting this analysis a court should not lose sight of the ultimate purpose of Section 113, which is to determine whether a defendant was sufficiently responsible for hazardous-waste contamination so that it can fairly be forced to contribute to the costs of cleanup.

---

5. We do not mean to suggest that no other factors would be relevant to this analysis. In *Concrete Sales and Services, Inc. v. Blue Bird Body Co.*, the court compiled a comprehensive list of factors that courts have considered in discussing "arranger liability," including: "(1) whether a sale involved the transfer of a 'useful' or 'waste' product; (2) whether the party intended to dispose of a substance at the time of the transaction; (3) whether the party made the 'crucial decision' to place hazardous substances in the hands of a particular facility; (4) whether the party had knowledge of the disposal; and (5) whether the party owned the hazardous substances." 211 F.3d 1333, 1336-37 (11th Cir. 2000). *See also State of New York v. Solvent Chem. Co.*, 225 F. Supp. 2d 270, 280-81 (S.D.N.Y. 2002) (compiling list of factors considered by other courts). Depending on the particular circumstances of a case, any of these factors, and quite possibly others not mentioned here, could be helpful in determining whether the defendant was sufficiently responsible for hazardous-waste contamination so that it can fairly be forced to contribute to the costs of cleanup. We think, though, that the factors we have identified — ownership or possession, knowledge, and control — are closely related to most or all of the other factors identified.

We believe that ownership or possession, knowledge, and control are the most critical factors in this analysis for the following reasons. First, proof of ownership, or at least possession, of the hazardous substance is required by the plain language of the statute. *See* 42 U.S.C. § 9607(a)(3) ("any person who . . . arranged for disposal or treatment . . . of hazardous substances *owned or possessed by such person* . . . .) (emphasis added). This required factor is the starting point in determining "arranger liability" because, of course, with ownership comes responsibility. *See Aceto*, 872 F.2d at 1382 (imposing "arranger liability" upon defendant that owned hazardous substance throughout formulation process because finding otherwise "would allow defendants to simply 'close their eyes' to the method of disposal of their hazardous substances").

As we said above, though, we do not think that proof of ownership or possession alone is a sufficient basis upon which to ground "arranger liability." A rule stating that this factor alone would suffice could broaden the sweep of Section 107(a)(3) beyond the bounds of fairness. If, for example, a defendant arranges for a plant to treat a hazardous substance that it owns or possesses, but has absolutely no control over the processing and no knowledge (or even reason to know) that the processing will result in the release of hazardous waste, it would be unfair to require that defendant to contribute to the cost of cleanup. Imposing liability on the defendant under those circumstances would go beyond Congress's intent to require those "actually responsible for any damage, environmental harm, or injury from chemical poisons" to share in the cost of cleanup. *Bestfoods*, 524 U.S. at 55-56 (citations omitted).

Second, proof of a defendant's knowledge that hazardous waste can or will be released in the course of the process it has arranged for, provides a good reason to hold a defendant responsible because such proof demonstrates that the defendant knowingly (if not personally) contributed to the hazardous-waste contamination. Thus, general knowledge that waste disposal is an inherent or inevitable part of the process arranged for by the defendant may suffice to establish liability. *See Aceto,* 872 F.2d at 1384.

This factor can be satisfied by proof of either actual knowledge (e.g., a provision in an agreement estimating the amount of environmentally harmful spillage inherent in the processing of the defendant's materials), or presumed knowledge (e.g., the defendant is familiar with industry custom, which is that the processing of the particular material normally results in the release of harmful wastes). *See Cello-Foil Products*, 100 F.3d at 1231 (concluding that "intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances" when evaluating "arranger liability"); *Montalvo*, 84 F.3d at 409 (indicating that inference that defendants had knowledge that arranged for activity would entail spilling of pesticides and draining of contaminated rinse water would expose defendants to "arranger liability").[6]

And third, proof that the defendant had control over the process could establish that the defendant was responsible for the resulting release of hazardous wastes. *C.f. Shell Oil*, 294 F.3d at 1055, 1057 (suggesting that "actual control" rather than simply "authority to control" must be shown); *General Elec. Co. v. AAMCO Trans., Inc.*, 962 F.2d 281, 286-87 (2d Cir. 1992) (implying that obligation to exercise control alone satisfies "arranger liability" standard). In many instances, proof of control could also create an inference that the defendant had knowledge that the process resulted in the release of hazardous wastes.

---

6. In *Shell Oil*, the Ninth Circuit distinguishes between "Direct Arranger Liability" and "Broader Arranger Liability." 294 F.3d at 1054-55. The court describes the former as involving a transaction in which the " 'sole purpose . . . is to arrange for the treatment or disposal of hazardous wastes.' " *Id.* at 1054 (citation omitted). In other words, "[a] direct arranger must have direct involvement in arrangements for the disposal of waste." *Id.* at 1055. The scienter required for "Direct Arranger Liability" appears to be specific intent or at least specific knowledge of the waste disposal. Either level of scienter is higher than the general knowledge level that we require. Logically, though, if a plaintiff can prove that a defendant had specific knowledge or specific intent, the plaintiff can also prove the defendant had general knowledge. Accordingly, we see no reason to draw a distinction between direct and broad (or indirect) "arranger liability." After all, there is only one category of "arranger liability" under Section 107(a). We believe that only one set of factors is required to analyze it.

Accordingly, we see these two factors as somewhat interrelated.

In sum, we conclude that the analysis of "arranger liability" under Section 107(a)(3) should focus on these principal factors: (1) ownership or possession of a material by the defendant; and (2) the defendant's knowledge that the processing of that material can or will result in the release of hazardous waste; or (3) the defendant's control over the production process. A plaintiff is required to demonstrate ownership or possession, but liability cannot be imposed on that basis alone. A plaintiff is also required to demonstrate either knowledge or control. We identify these principal factors to establish the base-line for analysis of "arranger liability" in this Circuit. It is certainly possible that other factors could be relevant to this analysis in a given case, and we encourage consideration of those as well.

## B. Disputed Material Facts With Respect to Morton's CERCLA Claims

Tenneco concedes that mercury is a hazardous substance and that there was a release from the plant which has caused Morton to incur response costs. Morton asserts that Tenneco is liable because of two different types of transactions — those involving PVM and those involving "dirty mercury" — both of which comprise an arrangement for the disposal of a hazardous substance under Section 107(a)(3). The District Court found, however, that there was insufficient evidence supporting Morton's claims to survive Tenneco's summary judgment motion. We will review each of Morton's claims under the "arranger liability" standard articulated above to determine if the District Court correctly granted judgment to Tenneco.

Our standard of review applicable to an order granting summary judgment is plenary. *See Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). We apply the same test employed by the District Court under Federal Rule of Civil Procedure 56(c). *See Kelley v. TYK Refractories Co.*, 860 F.2d 1188, 1192 (3d Cir. 1988). Accordingly, the District Court's grant of summary judgment in favor of Tenneco was

proper only if it appears that "there is no genuine issue as to any material fact and that [Tenneco] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the evidence, we "take the facts in the light most favorable to the nonmoving party, [Morton], and draw all reasonable inferences in [its] favor." *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (citation omitted).

### 1. PVM Transactions

Morton alleges that Tenneco engaged in two types of "toll" or "conversion" transactions with the plant involving PVM, both of which comprise arrangements for the disposal of hazardous substances owned by Tenneco under Section 107(a)(3). Basically, Morton contends that Tenneco purchased the PVM either from the plant or some other supplier and then paid a fee to the plant for the conversion of the PVM into ROM or YOM. In either case, Morton argues, Tenneco owned the PVM throughout the conversion process, and was aware that the conversion process inevitably resulted in the release of hazardous waste.

### a. Ownership or Possession

The District Court addressed the issue of ownership or possession, and found that "the record evidence shows" that Tenneco did not own or possess the PVM that was processed at the plant. (App. at 12-13). The Court based its finding on two conclusions. First, the Court reasoned that whether Tenneco purchased the PVM through a broker or from the plant directly, the "ownership" alleged by Morton was a bookkeeping function done solely for the purpose of minimizing the plant's financial risk in the volatile mercury market. And second, the Court determined that there was not a "showing that Tenneco was the necessary source of the PVM," or that "Tenneco was a manufacturer of PVM." *Id.* at 13.

We will look first at the District Court's conclusion that the "toll" or "conversion" transactions used by the plant were solely for the purpose of minimizing the plant's financial risk in the volatile mercury market. One problem

with this conclusion is that it is an inference drawn in favor of Tenneco rather than Morton, the party opposing the motion. Another problem is that the conclusion inappropriately resolves a material factual dispute.

Citing the plant brochure and the deposition testimony of several former plant managers, Morton explains that the plant customers, including Tenneco, had the option of supplying their own PVM and storing it in the plant's vault or purchasing it directly from the plant. If the customer chose the first option, the plant would charge for the processing of the PVM into ROM or YOM and for insuring the mercury while it was stored at the plant, but the customer owned the mercury "at the beginning, middle, and end of the process." (Morton Brief at 13) (citing App. at 660, 881, 458). In fact, one plant manager testified that when customers supplied PVM for processing, the customers continued to hold title to it while it was at the plant. *Id.* (citing App. at 238-240). Morton asserts that Tenneco was "a major conversion customer" from at least 1963 to 1973, and that it supplied significant amounts of PVM to the plant for processing. (Morton Brief at 13-14) (citing, *inter alia*, numerous weekly Physical Inventories and weekly Customer Ownership Reports documenting the number of Tenneco-owned pounds of mercury stored at the plant and converted into ROM and YOM).

To be sure, Tenneco disputes Morton's contention that it owned the PVM throughout the process. Tenneco contends that the plant used certain billing methods (which look like "conversion" or "toll" agreements) "to protect itself from the price volatility of the mercury market and the associated financial risk . . . ." (Tenneco Brief at 6). Tenneco also asserts that the PVM it allegedly owned was never segregated or labeled as belonging to it at any point in the process. *Id.* at 21-22 (citing App. at 533-34). In fact, Tenneco maintains that the customer-delivered PVM was not the actual mercury used to manufacture that customer's ROM and YOM because mercury is homogeneous; instead the mercury was added to the plant's inventory, like money in a bank. *Id.* at 22-23 (citing App. at 635-38, 533-34, 472-73). (Thus, Tenneco's ownership of the PVM that was converted at the plant on

Tenneco's behalf is very much in dispute. Morton has submitted evidence, including plant records and the testimony of former plant managers, from which it is fair to infer that Tenneco owned the PVM (regardless of whether it purchased it from the plant or a third party) throughout the conversion process. Proof of ownership, of course, is one of the principal factors in the "arranger liability" analysis. Therefore, this evidence is sufficient to withstand Tenneco's motion for summary judgment.[7]

### b. Knowledge

Although the District Court did not directly address the knowledge factor, it discussed evidence that is relevant. The Court referred to a memorandum from the United States Environmental Protection Agency ("EPA") cited by Morton and concluded that the reference therein to Tenneco's disposal of mercury by-products was "just not enough" evidence to survive a motion for summary judgment. (App. at 14, 15).

Before we discuss the other evidence related to

---

7. Although we have already identified material disputed facts on the issue of ownership that warrant remand for further consideration, we pause to consider Tenneco's argument that because mercury is homogenous, it could not have been owned by any particular customer throughout the oxide processing at the plant. *See supra*. Tenneco's own analogy to money in a bank suffices to demonstrate the unreasonableness of its argument. When money is deposited in a bank the depositor does not cease owning the money because the actual dollars and cents it deposited are fungible and are used by other customers. Whether the plant segregated each customer's PVM or simply added it all together is inconsequential. The ownership or possession factor can be satisfied by proof that Tenneco owned or possessed the amount of PVM that it paid to have processed into ROM and YOM. *See* App. at 881 (Wood Ridge Chemical Corporation Balance Sheet and Auditor's Report, stating: "Since mercury is homogeneous, it is not possible to physically identify owned from non-owned mercury, but records are maintained to account for customer-owned quantities."). Like ownership of money in a bank, Tenneco's ownership of a mercury is not refuted by proof that other customers used the exact PVM it initially deposited. *Cf. Hercules*, 247 F.3d at 721 (finding defendant owned material despite intermingling with other materials during processing).

knowledge that was submitted by Morton, we will address Tenneco's argument that the EPA memorandum should not be considered because it is not part of the record. Morton's counsel read a portion of the 1971 EPA memorandum during the summary judgment oral argument, but neglected to move its admission into the record. *Id.* at 80-81. Prior to filing its appellate brief, Morton moved the District Court to supplement the record with, among other things, the EPA memorandum. The motion was denied, and Morton has not appealed that decision. Because the memorandum is not included in the certified record, even after Morton's motion to supplement the record, Tenneco argues that we should not consider it at all. Tenneco argues, too, that Morton's counsel did not provide a copy of the document to either the District Court or opposing counsel. Morton asserts, however, that Tenneco produced this document during discovery. And, because counsel read the relevant portions of the memorandum into the record during oral argument without objection from Tenneco and because the District Court referred to the memorandum in her ruling, the memorandum is part of the record.

According to Federal Rule of Appellate Procedure 10(a), the record on appeal is comprised of (1) the original papers and exhibits filed in the district court; (2) the transcript of the proceedings; and (3) a certified copy of the docket entries. "This definition not only includes items admitted into evidence, but also includes items presented to the district court and not admitted into evidence." *Waldorf v. Shuta*, 142 F.3d 601, 620 (3d Cir. 1998) (citation omitted).

Here, it is undisputed that the EPA memorandum was never included in the record in its entirety. Given that the memorandum does not appear to have been presented to the District Court, we will not review it in its entirety (which is not possible as a practical matter in any event because the document was not included in the appendices). *See Waldorf*, 142 F.3d at 620 ("The basic purpose behind the rule is to prevent parties from supplementing the record on appeal with items never presented to the district court.") The next question is whether we can appropriately consider the portion of the memorandum that was read by Morton's counsel during oral argument and which is found in the

transcript. Because we conclude that Morton presented evidence other than the portion of the EPA memorandum to establish Tenneco's knowledge, and because we think that evidence created disputed facts, we do not need to decide whether it is appropriate for us to consider the memorandum on appeal. We leave it to the District Court to evaluate the admissibility of the document on remand.

As we just mentioned, Morton presented evidence other than the EPA memorandum to establish Tenneco's knowledge that the release of hazardous waste was an inherent and inevitable aspect of mercury processing. Specifically, Morton maintains that Tenneco was knowledgeable about mercury processing because it used ROM and YOM to manufacture products at its own facilities, and because it had produced mercury oxide at its Elizabeth facility in the past. (Morton Brief at 7-8, 9) (citing App. at 855). Morton contends that Tenneco must have been aware of the environmental risks inherent in mercury processing because "the hazards of handling and processing mercury were well known within the industry generally," and because "substantial mercury loss, as well as known losses in dust and vapor, were an inherent part of manufacturing mercury intermediates," and that those losses were "closely monitored by the Plant and its customers who provided the mercury." *Id.* at 9, 10 (citing App. at 940, 942, 932-33, 796, 252-53).

Tenneco does not dispute that it used ROM and YOM to manufacture its own products at its Elizabeth facility or that it produced mercury oxide at the same facility in the past. (Tenneco Brief at 24, 27). Instead, Tenneco accuses Morton of improperly relying on general facts about the plant's relationship with its customers rather than facts specific to the plant's relationship with Tenneco in attempting to prove Tenneco's knowledge that waste was released during mercury processing.

We think it is fair to infer from Tenneco's involvement with mercury oxides at its own facility that Tenneco had some knowledge about the environmental hazards of mercury processing. We also think it is fair to rely on evidence provided by Morton about the plant customers generally. While Morton did not present evidence showing

that Tenneco, specifically, was monitoring the mercury losses during processing at the plant, it was not required to do so in order to survive Tenneco's motion for summary judgment. After all, Tenneco was undisputably one of the plant customers, and it is thus reasonable to infer (absent proof to the contrary) that it had the same kind of relationship with the plant as did the other customers. Whether a jury would ultimately be persuaded by this evidence is uncertain, but that is not the standard we apply in evaluating a summary judgment motion. Accordingly, we believe that there are disputed facts with respect to Tenneco's knowledge of hazardous waste releases during the processing of PVM at the plant. Because knowledge is one of the principal factors in the "arranger liability" analysis, this evidence is sufficient to withstand Tenneco's motion for summary judgment.

### c. Control

The District Court did not directly discuss this factor. But, related to control, the Court observed that it would not have mattered if Tenneco had shipped PVM directly to the plant on a regular basis because "it is what happened [at the plant] and [Tenneco's] involvement . . . with respect to what happened [at the plant] that's important." (App. at 12). We disagree with the Court's suggestion that proof that Tenneco shipped PVM directly to the plan would have been irrelevant. Such proof could demonstrate Tenneco's ownership, or at least possession, of the PVM. More importantly, though, the parties dispute Tenneco's level of control over "what happened" at the plant.

Morton states that "customers such as Tenneco played a key role in shaping the Plant's production processes and its resulting emissions" by approving a new process for mercury oxide manufacturing in the late 1960's. (Morton Brief at 11) (citing App. at 827-28, 923, 952, 953, 406-10). Morton argues that the customer's approval of the production process amounted to some control over the production process. Tenneco, however, disputes Morton's assertion that it had any control over the plant operations or disposal practices. (Tenneco Brief at 12-13) (citing App. at 504, 268, 340-42, 244-50).

Again, Morton's evidence about the customers generally is relevant — Tenneco was undisputably a customer of the plant. Whether this evidence alone is sufficient to establish control is another matter. Because we are remanding this case to be analyzed under the standard articulated above, we suggest that the District Court consider this evidence in the subsequent proceedings.

### d. Useful Product Defense

The District Court characterized the PVM transactions as "sales transactions" and referred to the "useful product defense" discussed in *Pneumo Abex Corp. v. High Point, Thomasville and Denton R.R. Co.*, 142 F.3d 769, 774 (4th Cir. 1998). (App. at 13-14). Tenneco argued below, and continues to argue on appeal, that this defense applies because the transactions at issue were nothing more than a sale of a useful product (PVM) and a purchase of finished products (ROM and YOM). We believe that there are disputed facts with respect to the critical elements of this defense.''

In *Pneumo Abex*, the court concluded that " 'treatment . . . of hazardous substances' as used in CERCLA refers to a party arranging for the processing of discarded hazardous substances or processing resulting in the discard of hazardous substances." 142 F.3d at 774. Accordingly, the sale of valuable materials to a processor alone does not satisfy the requirements for "arranger liability." *See Glaxo Wellcome, Inc.*, 189 F.3d at 164; *Solvent Chemical Co.*, 225 F. Supp. 2d at 280.

We agree with Tenneco that the sale of PVM alone or the purchase of ROM and YOM alone — without evidence of ownership or possession, knowledge, and control — would not be sufficient grounds on which to impose "arranger liability." Those transactions would either not meet the standard we have articulated or would fall within the "useful product defense." It would be inappropriate at this stage in the proceedings, however, to conclude that the transactions between Tenneco and the plant were nothing more than a sale of PVM or the purchase of ROM and YOM because of the factual disputes we have described with

respect to the key elements of ownership or possession, knowledge, and control.

### 2. "Dirty Mercury" Transactions

Morton asserts that Tenneco shipped its own "dirty mercury" to the plant for processing into usable mercury, a transaction which clearly qualifies Tenneco for "arranger liability." (Morton Brief at 15). Morton contends that it submitted evidence sufficient to survive summary judgment on this claim. Tenneco argues that Morton did not present this claim to the District Court at all.

It is true that Morton did not include the "dirty mercury" allegation in its Statement of Contested Facts for the Pretrial Order. (Supp. App. at 2-3). As a general matter, the pretrial order will "control the subsequent course of the action unless modified by a subsequent order." Fed. R. Civ. P. 16(e). Moreover, the "finality of the pretrial order contributes substantially to the orderly and efficient trial of a case." *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1194 (3d Cir. 1987).

Nonetheless, "Rule 16 was not intended to function as an inflexible straightjacket on the conduct of litigation . . . instead, it was intended to insure the efficient resolution of cases and, most importantly, minimize prejudicial surprise." *Lamborn v. Dittmer*, 873 F.2d 522, 527 (2d Cir. 1989) (citations omitted). Accordingly, Morton argues that the issue is properly addressed on appeal because it raised the issue in its brief opposing Tenneco's motion for summary judgment.

In response to Tenneco's individual motion for summary judgment, Morton incorporated its Statement of Material Facts from the earlier summary judgment proceeding involving all of the defendants. In paragraph 10 of that Statement of Material Facts, Morton makes allegations about PVM and "dirty mercury" transactions against "The Customers" generally without specifying any customer by name. (App. at 157). In paragraph 11, Morton asserts that the "evidence confirming these transactions is overwhelming" and cites numerous pages of deposition testimony. *Id.* One of the cited portions of deposition

testimony indicates that Tenneco shipped "dirty mercury" to the plant. *Id.* (deposition transcript of Joseph H. Bernstein at 860).

The critical issue is whether Tenneco was on notice of Morton's "dirty mercury" claim during the summary judgment proceedings despite the fact that the claim was not included in the Pretrial Order. We find that Tenneco was sufficiently aware of the claim. Tenneco was presumably put on notice of Morton's allegation at the time of the Bernstein deposition given that Bernstein stated that he believed that Tenneco shipped "dirty mercury" to the plant. If not at the time of the deposition, Tenneco was surely on notice as of the time it received Morton's Statement of Material Facts during the first summary judgment proceeding. Finally, Tenneco was put on notice of this claim a third time when Morton incorporated its Statement of Material Facts into its response to Tenneco's individual motion for summary judgment. Thus, although Morton's failure to include this claim in the Pretrial Order violates the letter of Rule 16(e), our consideration of this claim on appeal does not violate the purpose of the rule, which is primarily to "minimize prejudicial surprise." *Lamborn*, 873 F.2d at 527.

Assuming we would consider the "dirty mercury" claim, Tenecco argues in the alternative that the District Court properly granted summary judgment to Tenneco because, quite simply,"Morton has absolutely no evidence to support such a claim." (Tenneco Brief at 57). We disagree.

Morton asserts that Tenneco shipped its own "dirty mercury" to the plant for processing into usable mercury. (Morton Brief at 15) (citing Bernstein Dep. at 40, 860). Morton maintains that the plant's standard operating procedure was to store "dirty mercury" in separate flasks labeled with the customer's name and date received and then to purify the mercury by a furnace-operated distillation process, which produced environmentally harmful residue. *Id.* (citing App. at 431-32, 443, 447, 461-63, 868-69, 954). Morton contends that customers were apprised of the fact that "a certain percentage of mercury would be lost in the process." *Id.* (citing App. at 963-65, 263). This evidence is sufficient to at least create a disputed

fact with respect to each of the principal "arranger liability" factors — ownership or possession, knowledge, and control. Therefore, under the standard we have just articulated, this evidence suffices to survive summary judgment.

### 3. *Spill Act and Common Law Claims*

The District Court did not discuss Morton's Spill Act claim or its common law contribution claim, but it nevertheless granted summary judgment to Tenneco on both. Because the Spill Act is the "New Jersey analog to CERCLA," the standards for liability are the same. *See SC Holdings, Inc. v. A.A.A. Realty Co.*, 935 F. Supp. 1354, 1365 (D.N.J. 1996); *State of New Jersey v. Gloucester Environmental Management Servs., Inc.*, 821 F. Supp. 999, 1009 (D.N.J. 1993). Therefore, we vacate the District Court's grant of summary judgment on the Spill Act claim for the same reasons that we vacate judgment on the CERCLA claim. We conclude, however, that the District Court's grant of judgment to Tenneco on the common law contribution claim was appropriate because that claim is preempted by CERCLA Section 113(f). *See In the Matter of Reading Co.*, 115 F.3d 1111, 1117 (3d Cir. 1997) (holding that CERCLA Section 113(f) preempts common law contribution claim).

## IV. Conclusion

Because there are disputed material facts with respect to Morton's CERCLA and Spill Act claims against Tenneco, we will vacate the District Court's grant of summary judgment and remand those claims for further proceedings consistent with this opinion. Because Morton's common law contribution claim is preempted by CERCLA, we will affirm the District Court's grant of summary judgment to Tenneco.

A True Copy:
       Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*